IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Criminal Action No. 14-cr-163

UNITED STATES OF AMERICA,


    Plaintiff,

vs.

SHANNON CONLEY,

    Defendant.

_____

**REPORTER'S TRANSCRIPT**

SENTENCING HEARING

_____

    Proceedings before the HONORABLE RAYMOND P. MOORE, Judge, United States District Court for the District of Colorado, occurring at 1:30 p.m., on the 23d day of January, 2015, in Courtroom A601, United States Courthouse, Denver, Colorado.

**APPEARANCES**

    GREGORY HOLLOWAY, Assistant U.S. Attorney, 1225 17th Street, Suite 700, Denver, Colorado 80202, appearing for the Government.

    ROBERT PEPIN, Assistant Federal Public Defender, 633 17th Street, 10th Floor, Denver, Colorado 80202, appearing for the defendant.


TAMMY HOFFSCHILDT, Official Reporter
901 19th Street, Denver, Colorado 80294
Proceedings Reported by Mechanical Stenography
Transcription Produced via Computer

1          **P R O C E E D I N G S**

2          (In open court at 1:30 p.m.)

3              *THE COURT:*  Please be seated.  14-cr-163, United

4    States versus Shannon Maureen Conley.

5              I will take appearances, please.

6              *MR. HOLLOWAY:*  Good afternoon, Your Honor.

7    Greg Holloway, Assistant United States Attorney on behalf of

8    the United States of America.  With me is Task Force Officer

9    Chris Byrne of the Joint Terrorism Task Force.

10             *THE COURT:*  All right.  Good afternoon to both of you.

11             *MR. PEPIN:*  Robert Pepin, appearing on behalf of

12   Ms. Conley.  She is present, in custody.  Your Honor, with me

13   at the Defense Counsel's table is Rivka Morgan-Sherman from my

14   office.

15             *THE COURT:*  Good afternoon to all of you, as well.

16             Let me touch on three things before we get started in

17   earnest.

18             First, I have been known to mispronounce John Smith,

19   and I guarantee you I'm going to mispronounce some names here

20   today.  To extent that I do so, don't be shy in correcting my

21   pronunciation, and I apologize to anyone whose name I may

22   mispronounce.

23             Secondly, for the record, I have reviewed all of the

24   information that's been made available to me, and that is a

25   great deal of information.  I have reviewed, obviously, the

1    presence report.  I have reviewed the psychiatrist report, I

2    have reviewed the psychologist's report, I have reviewed the

3    pleadings and the attachments, the multiple pleadings and

4    attachments filed by the parties in connection with sentencing

5    I'm aware of additional matters, by virtue of the Government's

6    earlier filing in opposition to a bond motion that contained a

7    number of 302s, and I have reviewed those, as well.

8         Obviously, the charging documents are there.  I simply

9    want you to all know that -- oh, and I have also reviewed the

10   report from Mr. Elibiary, that was provided late yesterday

11   afternoon.

12        So I have more information available to me in this

13   case than in most cases -- most criminal cases that I have

14   sentenced, and I want you to know that I'm familiar with all of

15   it.

16        Thirdly, I want to make sure that we keep our eye on

17   the prize, so to speak.  What I mean by that is, this case has

18   a tendency -- or has developed a tendency, at least outside of

19   the courtroom, to drift in all kinds of directions as to how

20   it's described, and there's a little bit of that that's going

21   on in the courtroom.

22        I feel like I'm standing on a beach in what I think is

23   the ground covered by the charge, and I turn and look in one

24   direction and I see Mr. Holloway with his flag walking away

25   from me, intending to plant his flag somewhere, other than

1  where I'm standing, and I turn and I see Mr. Pepin heading in

2  the opposite direction with his flag, going in equal distance

3  from where I am.

4    Let me tell you what I mean by that.  For example, and

5  I am not being critical, I know that it is advocacy and it is

6  the importance of this case that leads the parties to take the

7  positions that they take; but, starting with Mr. Holloway, for

8  example, you took issue with a characterization of the offense

9  as innocuous, or some words to that offense -- or some words to

10  that affect, and filed a document in which you said to me that

11  the defendant's crime is serious.  She professed a desire to

12  support violent jihad.  Her crime -- She was openly hostile to

13  an Aryan Christian church.  She practiced shooting.  She

14  displayed a pattern of self-radicalization, things of that

15  nature.  I'm not saying that, for a moment, that's not

16  relevant.  I'm not even going to -- if you perceive that in my

17  words, you are mistaken; but it is not the crime.

18    This case morphed, twice, and it has taken a bit of a

19  careful eye to keep track of the changes that have occurred.

20  The first change that occurred was when it went from a

21  conspiracy, in the Complaint, under 18 U.S.C. Section 2339B, if

22  I have got that correct, to 18 U.S.C. Section 371 Conspiracy

23  which was different.  At least to some extent in its elements

24  and certainly with respect to its exposure.

25    Then, at sentencing, it morphed a second -- excuse me

1  at the Change of Plea it morphed a second time.  The second

2  time it morphed, is that although the information spoke of a

3  time period from September until the date of her arrest, that

4  got contracted, severely contracted, and the factual basis was

5  that her conspiracy with Mr. Mouelhi, is how I'm going to say

6  it, how you actually say it I have no idea, began in February

7  of 2014, and persisted for a month or two.  And so much of this

8  activity that's referenced by you, occurs long before that, and

9  before the conspiracy begins, as the conspiracy is described in

10  the plea documents, and it is not the crime.

11          Turning to the other direction on the beach.  I have

12  the Defendant saying to me, that -- again and I exaggerate --

13  but that much of this is not as significant as it may appear.

14  Her skills enabled her to change bedpans, and that's really,

15  kind of, what the extent of this conspiracy is; relatively

16  innocuous conduct.

17          Well, again, it's sort of the flip side of the

18  Government's version of not keeping an eye, if you would, on

19  the matters that were agreed to.  Because the matters that were

20  charged in the Information, as well as the matters that were

21  admitted in the Plea Agreement include the statement that

22  Ms. Conley was to refine, obtain additional training and skills

23  in order to provide support and assistance, and to fight,

24  should it be deemed necessary.  And so it is not just bedpans,

25  either.

1          Enough of that.  Let's get down to business.  I just
2    want to make sure that we focus on -- there's a lot of stuff
3    that's relevant here, but that we correctly describe what it is
4    that's before me, because that's what I have got to deal with,
5    not some less significant version of this crime.  Not some more
6    significant version of this crime.  This crime.  This
7    defendant.  This case.
8          Now, at this time I formally accept the Plea
9    Agreement, pursuant to which a plea of guilty was made on
10   September 10, 2014.
11         Mr. Pepin, have you received a copy of the presentence
12   investigation report prepared in this matter, including all
13   addenda within the timeframes provided by Rule 32; the last
14   addenda being one that set forth, for your information, the
15   standard terms and conditions of supervised release that are
16   referenced in the Presentence Report, and had sufficient time
17   to review those matters with Ms. Conley?
18         *MR. PEPIN:*  Yes, Your Honor.  Thank you.
19         *THE COURT:*  And, Mr. Holloway, have you likewise
20   received and had sufficient time to review these matters?
21         *MR. HOLLOWAY:*  Yes, I have, Your Honor.
22         *THE COURT:*  In light of the filing yesterday
23   afternoon, have you had sufficient time to review that matter,
24   and are you prepared to address it, to the extent it is -- it
25   becomes an issue?

1          MR. HOLLOWAY:  Um, I don't think I have had sufficient

2     time, but I'm ready to proceed; and by that, I will

3     specifically address that filing with the Court, and I will

4     appreciate the Court's indulgence with me in --

5          THE COURT:  I intend to be as indulgent as I can be

6     with both sides today.

7          MR. HOLLOWAY:  Fantastic.  Thank you, Your Honor.

8          THE COURT:  All right.

9          The Government has filed a Motion For Downward

10    Departure -- I'm sorry.  Let me start with this, ECF Number 68,

11    the Government has filed a Motion Pursuant To Guideline

12    3E1.1(b) For The Third Level -- or The Third Point For

13    Acceptance Of Responsibility.  That motion is granted,

14    obviously.

15         There's no dispute or contention here that there's not

16    been acceptance of responsibility on the part of Ms. Conley,

17    nor is there any dispute or contention that it has not been

18    timely.

19         Additionally, the Government has filed a Motion For

20    Downward Departure Pursuant To Section 5K1.1 Of The Guidelines.

21    And that's at ECF number 56.  It is a restricted document.

22         Mr. Holloway, let me ask you some questions.  I don't

23    intend to delve deeply into this, I also realize that sometimes

24    I fall into the habit of speaking in the code with which

25    practitioners are familiar.  What I'm talking about is a motion

1    that the Government has filed saying that Ms. Conley has

2    cooperated with the Government in a manner that is timely and

3    of substantial assistance to the Government, and based on that

4    cooperation, the Government has -- is recommending, pursuant to

5    the guidelines that a 20-percent departure be imposed, and that

6    I sentence her to no more than 48 months.  That is what has

7    been filed.

8          I'm not going to ask you to put on the record, here

9    today, the details of that cooperation.  I just want you to

10   confirm for me that what I have just said is true and that is

11   the position of the Government, that it is, in fact true?

12         MR. HOLLOWAY:  That is true.  To be specific, the

13   Government has agreed, as a result of her cooperation, to

14   recommend a sentence of 48 months.

15         THE COURT:  And is it -- I believe this is also true,

16   but, again, I just simply want to make sure that my

17   understanding is not dated.  You know, there are cases where,

18   at least historically, Assistant U.S. Attorneys had a great

19   deal of discretion, then there were cases where, historically,

20   where the matters that the U.S. Attorney would do, would have

21   to be approved by a supervisor or perhaps the U.S. Attorney.

22   And then there is another class of case where decisions are

23   approved, and I am not interested in putting names -- spraying

24   names before the Court, but approved at higher levels at the

25   Department of Justice in Washington, DC.

1          Is this such an occasion?

2          *MR. HOLLOWAY:*  There are aspects of this case that

3  have required approval by components within the main justice in

4  Washington, DC.

5          *THE COURT:*  Is there any opposition from main justice

6  to the recommendation that you have made?

7          *MR. HOLLOWAY:*  There is not, with regard to the 5K.

8          *THE COURT:*  All right.  I will grant the motion.

9          *MR. HOLLOWAY:*  Thank you.

10          *THE COURT:*  Now, where we are is that there are two

11  motions that the Defendant has filed.  That's incorrectly said.

12  There are two pleadings that the Defendant has filed, that

13  require some action by the Court, before we can get to the

14  business at hand, so to speak.

15          The first is, the Defendant has filed a lengthy list

16  of objections to the PSR, and I want to deal with those in --

17  well, in order, and we will see, rather -- so let's just --

18  frankly, Mr. Pepin, I'm comfortable, since I'm going to be

19  bouncing back and forth with you, if you want to show us how

20  straight and erect you can stand, I'm more than happy to watch

21  you, but I'm fine with you responding from a seated position as

22  long as you can pull that mike over so I can pick you up.

23          *MR. PEPIN:*  I can do that.

24          *THE COURT:*  The first objection had to do with a

25  two-point assessment, and to be frank about it, the two-point

1    adjustment, I believe that the probation department's final

2    guideline offense level was 37.

3         *PROBATION:*  That is correct, Your Honor.

4         *THE COURT:*  All right.  And the parties had estimated

5    that it would be 35, and the reason for the difference is that

6    in the applicable guideline, 2M5.3(b)(1), there is a two-point

7    assessment for if the offense involved, among other listed

8    item, materials, support or resources with the intent to

9    acknowledge or reason to believe they were to be used to commit

10   or assist in the commission of a violent act.  And probation

11   determined that was an appropriate addition.

12        Mr. Pepin, you have objected.  In some ways this is a

13   tempest in a teapot.  And what I mean by that is simply that

14   regardless of whether this is a 35 -- Offense Level 35,

15   Criminal History Category VI or Offense Level 37, Criminal

16   History Category VI, both of those guidelines are significantly

17   above the statutory maximum, and by law, when that occurs, the

18   statutory maximum in this case, 60 months, become the guideline

19   range, but the tempest does brew in the teapot, and so if there

20   is anything more that you want to add, other than what you have

21   already submitted in writing, I would be happy to hear it?

22        *MR. PEPIN:*  Your Honor, we've submitted our argument

23   in writing, and I am not going to belabor it.

24        *THE COURT:*  All right.  And I am going to overrule the

25   objection, again, because I go back and look at the Plea

1  Agreement, and it did agree that the object of the conspiracy

2  was to provide training and assistance and support.

3          Admittedly, the facts that Mr. Pepin points to, which

4  is that she was not the most skilled or knowledgeable person,

5  is well taken, but she did have skills.  In fact, you are

6  required as a CNA to obtain a certification from the state.

7  She obtained that certification.  There are aspects of vital

8  signs and things of that nature that I would say are beyond

9  general knowledge, and to the extent that there's a question as

10  to whether she obtained this information or this training with

11  the intent to share that's irrelevant.  It's a conspiracy to

12  provide it.  It is not the case that the conspiracy requires

13  that you obtain that which you you desire to share with a

14  terrorist group during the course of the conspiracy.

15          The conspiracy requires that you attempt to provide

16  such training and assistance, and to the extent that she never

17  actually did perform those acts, again, my point is, simply,

18  that it is conspiracy charged, and the conspiracy is complete

19  upon the formation of the intent and the agreement, and

20  therefore the fact that she didn't actually do anything is

21  legally irrelevant.

22          As a consequence of that, where I think we are is that

23  we are dealing with the Total Offense Level 37, Criminal

24  History Category of VI, which results in an imprisonment range

25  of 60 months, a fine range of $20,000, $200,000,

1   supervised-release range of one to three years.

2       There were other objections that are here.  The other

3   objections are largely, I would say, clarifications, and the

4   provision of additional information for me to consider.

5       MR. PEPIN:  Yes, Your Honor, I think that's a fair way

6   to characterize it.  There were a number of circumstances where

7   I felt that the description and the amount of -- of -- and the

8   amount of information that was provided did not complete the

9   story, concerning the information that was available, that

10  would have been gotten from that, and I tried to provide that

11  through the course of these other comments and clarifications,

12  including citing to specific areas that I note.  Of course

13  there's been a response by the probation department, a number

14  of my clarifications have been absorbed into the -- the

15  probation presentence investigation report now, and where some

16  may remain, I think that the counterpoints have been made, at

17  least I hope so, through my response.

18      THE COURT:  Well, I went through them one at a time

19  and found that this was a desire, I think, for the most part to

20  incorporate many of the clarifications into the final

21  presentence report; two that were intended that didn't quite

22  get done, relates to your objection, F-3, where you note that

23  the word "no" should appear between "we" and "longer" in the

24  fourth line.  I knew that when I read it the first time.  I

25  note that probation meant to, by virtue of the addendum, to

1    make that correction, and it just slipped through a crack.

2           Justine, would you just correct that, because it

3    relates to an incident that I think is important, and so, at

4    some point prior to this would you insert that word?

5           *PROBATION:*  Absolutely, Your Honor.

6           *THE COURT:*  The other one that was intended was

7    your -- in the same subsection, paragraph four, there was a

8    description -- well, a dispute about whether it should say

9    Christianity or Catholicism.  I understand it said Christianity

10   and should have said Catholicism.  I understand your position.

11   Probation meant to change it, but I think it still says

12   Christianity.  I can tell you it makes no difference to me, and

13   I would not rely, for sentencing purposes, on whether a program

14   that she went to was a Catholic program or a Christian program

15   and so I note the clarification, am aware of it, but it really

16   is not something that would be taken into account or affect the

17   sentence.

18          I'm happy to proceed in either of two ways, I think

19   that is true, with respect to much of the rest of these things,

20   several of them have been corrected.  There are some, and we

21   can go through whichever ones you wish to say are still live or

22   in play.

23          If you wish not to engage in that exercise, because

24   they are in the nature of clarifications, I would tell you,

25   that with respect to them, I don't think that there is anything

1    in here where the position taken is not understood by me.

2         In the course of sentencing we will discuss this

3    notion as to whether she has or has not completely and totally

4    disavowed her desire to rage jihad, but that aside, I think the

5    rest of that is not anything I need to rule on, but if you want

6    me to, I will.  So I'm putting it in your hands I suppose.

7         MR. PEPIN:  And I appreciate that, Your Honor.  I

8    don't know that I need a ruling.  What I needed was for there

9    to be a complete picture, and when I received the report and

10   saw that there were certain characterizations, many of them

11   negative, which did not provide the complete picture, I felt

12   incumbent upon me to make sure, as Ms. Conley's attorney, and

13   knowing the complete picture, that you knew it too.

14        Now if you have -- if you're aware of those

15   circumstances, now, as a result of my pleadings, recognize that

16   there are fuller pictures.  If a letter is written, maybe it

17   should say, all aspects of it, for instance, or it should be a

18   more complete picture about what it says, or you know a variety

19   of things, because it was a large presentence investigation

20   report, but a lot of those materials, hence, my overly

21   voluminous response.  So as long as this --

22        THE COURT:  Single-spaced to fit within my page

23   limitations.

24        MR. PEPIN:  Your Honor, we looked to see whether or

25   not single- or double-spaced was required and note there was no

1  indication single or double, I understand that may change at

2  this point --

3          THE COURT:  I get it.  I get it.

4          MR. PEPIN:  I understand that may change, but that's

5  exactly right.

6          So in any event, I -- I just want to make sure that

7  when we're talking about the picture that's painted, and the

8  Court is working from, that it's complete.  If not, I can make

9  it complete.

10         THE COURT:  Every single piece of paper that has been

11 filed has been read word for word, and is rattling around in

12 that brain of mine somewhere.  I have looked at it and

13 considered everything.

14         The only other thing I want to expressly overrule is

15 the objection to the justification.  I think the probation

16 department is entitled to have an opinion and I understand the

17 contrary view.  I also want it to be known that, in fact, I

18 told probation, I don't want some vanilla position for me.  The

19 probation department wants to make recommendations, where one

20 leg is on one side of the fence, the other leg is on the other

21 side of the fence, and the picket is an uncomfortable place,

22 it's not very useful to me.

23         MR. PEPIN:  May I briefly comment about that, because

24 I read the probation's response concerning that, and perhaps

25 it's because in all of those words I jammed in single-spaced, I

1    wasn't as clear as I would have liked to have been.

2           I disagree with the representations, because they were

3    in -- based upon the incomplete representations throughout the

4    entire report.  That was number one.

5           THE COURT:  That's right.  That was number two I was

6    dealing with.

7           MR. PEPIN:  But number two, I was only really

8    objecting to one word, and that was the reference to a personal

9    comment by the probation department that she thought that a

10   particular sentencing range was appropriate.  That, I don't

11   think, and hence my comments about her not being Congress or

12   the President or the Sentencing Commission, that I don't think

13   is appropriate, I don't think it fits within the statute,

14   that's what my objection is.  She responded as if I was

15   referring to the fact that she is not allowed to offer an

16   opinion at all, which of course she is.

17          So you know, I --

18          THE COURT:  I understand your position, I overruled

19   that objection, explicitly.  I believe that the recommendation

20   is just that.

21          You know, the notion that I'm going to be swayed,

22   against my will or in spite of my will or in any way by what

23   probation puts forward as a recommendation is a little bit --

24   actually, a great bit fictional.  I consider their view.  I

25   consider the Government's view.  I consider the Defense's view.

1   And I consider things that I think are important and nobody has

2   paid any attention to it.  And I understand the position that

3   you took.  I don't think it is contrary to statute.  I don't

4   think the statute says you can only speak in these areas and in

5   no other, and they made their recommendation, and I overrule

6   your objection to it.

7           *MR. PEPIN:*  Thank you.

8           *THE COURT:*  All right.  So where that puts us is on

9   the issue of sentencing directly, and I told you where we are,

10  in terms of the guidelines, and I have told you that I granted

11  the Government's 5K Motion.

12          Mr. Holloway, the podium is yours.

13          *MR. HOLLOWAY:*  Thank you, Your Honor.

14          I want to begin by explaining to the Court that I'm

15  going to focus my comments about this on how I view the factors

16  that we need to consider under Title 18 United States Code

17  Section 3553(a), because I think that's what the issue is

18  before the Court, ultimately.

19          The guidelines reach what they reach, which sky rocket

20  above the statutory maximum.  So the fact of the matter is,

21  we're here to decide the sentence largely based upon the

22  Court's evaluation of the factors enumerated in Title 18

23  Section 3553(a), and so, as we all know, it requires analysis

24  of basically four things.  The seriousness of the offense --

25          *THE COURT:*  I think it's seven things, but you go

1  right ahead.

2       *MR. HOLLOWAY:* I'm going -- I, unlike, Mr. Pepin, I

3  try not to single space, and I believe there's --

4       *THE COURT:* Now, now, now, play nice people.

5       *MR. HOLLOWAY:* So I will confine my analysis to those

6  things, because I think they are relevant.

7       *THE COURT:* Go ahead.

8       *MR. HOLLOWAY:* So first is the seriousness of the

9  offense, second is to afford deterrence, third is to protect

10 the public and then there's also the analysis about the various

11 treatments and medical needs for the defendant.

12      *THE COURT:* And just so that we're on the same page,

13 okay, it is actually seven factors not five -- not the ones you

14 are listing. You are focused on one of those seven that tends

15 to be the one the Government focuses on often, and that one has

16 many subparts, but there are others. There's the nature and

17 circumstances --

18      *MR. HOLLOWAY:* Yes.

19      *THE COURT:* -- of the offense and the history

20 characteristics of the defendant, there's the need for

21 deterrence --

22      *MR. HOLLOWAY:* Yes.

23      *THE COURT:* -- there are -- there's the need to avoid

24 unwarranted sentencing disparities. There's the need to

25 provide restitution, which has no bearing in this case

1  whatsoever. There is consideration of the guidelines, which I
2  have done. There's consideration of the policy statements,
3  which I have done. And in terms of unwarranted disparity,
4  certainly you can address that to the extent that you want to,
5  but that horse has left the barn. And what I mean by that is
6  simply this, you know and I know that most of the time this
7  offense is charged a 2339B.
8          *MR. HOLLOWAY:* Exactly.
9          *THE COURT:* And if charged as such, it has a 15-year
10 maximum, and contrary to what you put on your criminal
11 information sheet, it has a lifetime of supervised release, as
12 a potential exposure. By virtue of the decision to dial it
13 down into a section 371 conspiracy, it reduces those penalties,
14 and my guess is, if I was trying to be not disparate to others
15 similarly sentenced, I can't do it.
16         *MR. HOLLOWAY:* That is correct.
17         *THE COURT:* So you know that is what it is, and we end
18 up, after all of this discussion, talking about two of the
19 seven factors. From you I'm going to hear about the second
20 factor, what I will call the public-interest factors, for
21 shorthand.
22         *MR. HOLLOWAY:* Certainly.
23         *THE COURT:* And I am sure that for Mr. Pepin I will
24 hear from the first, the nature and the circumstances of the
25 offense and history and characteristics of the Defendant. But

1    go ahead.  I just want it clear that I will not confine myself

2    to the box of factors that you started putting me in, because I

3    think it's too small a box.

4         MR. HOLLOWAY:  Certainly.  I will attempt to expand

5    the box.

6         THE COURT:  All right.

7         MR. HOLLOWAY:  Now, in looking at this offense, and

8    the seriousness of it, and even the nature and circumstances of

9    it, I want to indicate, very clearly, that we need to disavow

10   any notion that the conduct here was not serious, and I am

11   concerned that the restraint showed by the Government in this

12   case, somehow has been misinterpreted or misconstrued as an

13   idea that this is not serious, and nothing could be further

14   from the truth here.  And being mindful of the Court's

15   instruction, to limit this --

16        THE COURT:  Not to limit your comments, just to make

17   sure that we know what the crime is.

18        MR. HOLLOWAY:  To keep our eye on the ball.

19        THE COURT:  And what is, perhaps, relevant

20   considerations, but not necessarily the crime.

21        MR. HOLLOWAY:  Certainly.  To boil it down, in spite

22   of multiple warnings, this Defendant decided to go and commit a

23   crime, and she decided to do so and join ISIS.

24        Now, we obviously, even after the defendant has been

25   arrested, but make no mistake, there is really no limit to the

1    depth of their perverted and moral depravity, and it is,

2    unfortunately, not beyond our imagination that this offense

3    relates to the idea that what could have happened was that ISIS

4    could have taken a disturbed young woman, and used them to

5    effectuate an attack on the United States.  And to avoid, you

6    know, that scary possibility, is to ignore the fact that this

7    is a group that beheads journalists and rapes women and

8    children, and sells them in slavery.

9         *THE COURT:*  Let's be clear, as between you and I, we

10   are both in full agreement that they are violent; that they are

11   unprincipled; that they practice savagery; and that they hide

12   it under a patina of religion.  But let's also be clear, that

13   this crime occurred at a point in time, and at the point in

14   time at which it occurred, much of what we now know about ISIS,

15   was not necessarily so clear.  I'm not saying that everyone

16   thought that they were, I don't know, a choir group.

17        I am saying that if you wandered around the United

18   States and said, "Who is ISIS?"  What you would hear is, "Roman

19   goddess," probably more likely than you would have heard, "The

20   Terrorist Group."  Now, they were clearly on the U.S.

21   Government radar.  They were clearly associated with al-Qaida.

22   All of that is true.  I'm not trying to minimize that in any

23   way, shape or form,  but they had not exposed their depravity

24   quite as much then, as they have now.

25        *MR. HOLLOWAY:*  No.  And I will admit to the Court, my

1    basis of knowledge was probably far greater than everybody

2    else's, at that point in time.

3              THE COURT:  Fair enough.  Again, I'm just trying to

4    keep this --

5              MR. HOLLOWAY:  I understand.

6              THE COURT:  -- in the context of what -- how I should

7    look at it, given the crime that I'm dealing with.

8              MR. HOLLOWAY:  Very well.

9              And so, understanding that, I want to stress that it's

10   important not to dismiss this as insignificant.

11             THE COURT:  You don't have to worry about that.

12             MR. HOLLOWAY:  Very well.  And I also want to be sure

13   that the restraint that the Government has exercised, and as

14   the Court has observed, is a function solely based upon the

15   specific facts of this case, and I made that decision about how

16   to proceed with the investigation, based on my faith in the

17   task force officer involved and my reading of the situation we

18   had at hand.

19             THE COURT:  Neither you nor the Government is under

20   charge here.

21             MR. HOLLOWAY:  I understand that.  But what I'm

22   concerned about is in the variety of pleadings, the impression

23   has been made that our exercise of that restraint is somehow

24   some signal that this is not serious, and I want to

25   emphatically point out that that is simply not true.  At least

1  from the analysis that I was engaged in, at the time, and am

2  still engaged in, now.

3       So this is a first for me, in doing a case where a

4  defendant, essentially, forced us to arrest them.  I mean, we

5  went to her multiple times in a genuine effort to short circuit

6  radicalization.  And we cautioned her about the illegality of

7  what she was was about to embark on, and in spite of those

8  repeated warnings, she did it, and the question becomes --

9       THE COURT:  I believe the comment was, I would rather

10  go to prison than do nothing, or words to that affect.

11       MR. HOLLOWAY:  That is correct.  And so that's what we

12  did.  And so I think that's important for the Court to

13  consider.  Even after the defendant has been in custody here,

14  it's been kind of a strange mix of behavior.  You know, she

15  cooperated, she provided us with information, and yet she

16  demonstrates kind of this -- this odd sort of defiance to

17  authority or vitriol, even when the process has gone out of its

18  way to try and demonstrate restraint and -- and -- and be

19  mindful of specific factual circumstances that we felt were

20  appropriate to try and take into account.

21       You know, otherwise we would be arguing about a

22  sentence at 15 years, rather than at five.  And so I think

23  that, you know, it's important for the Court to understand

24  that, again, the restraint that we attempted to show in this

25  matter, in no way reflects some idea that we didn't think this

1  was serious.

2      *THE COURT:* I understand.

3      *MR. HOLLOWAY:* Okay. And that brings me to the filing

4  that occurred quite late yesterday. Setting aside the rather

5  untimely nature of it, the Government has serious issues with

6  both this report and its author.

7      In my very limited ability to look into it, the author

8  completely, completely lacks credibility, and the content of

9  the report reflects that lack of credibility, as well.

10      Now, the report touts some Homeland Security Committee

11  and an award from the FBI Citizens Academy, that's akin to me

12  going out to me going out and buying a Seahawks jersey and

13  saying I'm going to be the quarterback in the Super Bowl.

14      *THE COURT:* It's a little more than that, but go

15  ahead.

16      *MR. HOLLOWAY:* Well, you know, without the benefit of

17  Cross-examination, you know, there are allegations that this

18  individual is under a -- at least was under a congressional

19  inquiry about mishandling and disclosing classified documents,

20  and there are issues people have taken with him about certain

21  public statements he has made about the inevitability of a

22  Muslim caliphate that ISIS has used to their benefit.

23      So what I'm saying is there are a number of reasons to

24  undermine the credibility of the author of this report.

25      *THE COURT:* And let's just stop having private

conversations.  Certainly there are times when it is
appropriate.  There are a number of facts about this case that
I think merit remaining private.

          MR. HOLLOWAY:  Very well.

          THE COURT:  Particularly, in the timeframe of October
2012; and I know that you're both sufficiently familiar with
the facts to know exactly what I'm talking about.

          MR. HOLLOWAY:  True.

          THE COURT:  But what we're talking about here is that
Mr. Elibiary, basically, submitted the report, that says that
she's not radicalized and with proper guidance that she moved
away from the self-radicalization to the extent that it never
existed, that with proper mentoring she poses no threat.

          MR. HOLLOWAY:  I would say in reviewing the report,
it's replete with factual errors and misstatements.  It appears
that he didn't carefully read the discovery.  And you know, his
basis also goes into this absurd notion that somehow the FBI's
effort to dissuade her from committing the crime, there were
errors made in that effort because --

          THE COURT:  They didn't bring a conservative enough
person to the table.

          MR. HOLLOWAY:  Exactly.  They weren't radical enough
to convince her not to do it, apparently.  Which I'm stunned by
the line where he says, "They erred because they presented her
with a moderate almost passivist version of Islam."  That's a

1  direct quote from that report.  It's astonishing to me that a

2  person would opine that by going to her and trying to convince

3  her not to -- to do the crime, you know, They erred because

4  they sent Muslims who weren't radical enough.

5       *THE COURT:*  Let me tell you, and Mr. Pepin will

6  obviously speak to this, I have read it, I have considered it,

7  I have my -- I have a number of questions of my own.  They are

8  different than yours.  I'm a little bit disturbed by the notion

9  of there being people who, because they are of a faith or

10  community, are better able than anyone else; to say whether

11  someone is good, bad, up, down, radical or not.  I don't care

12  whether you are talking about a Muslim talking about Muslims or

13  black talking about black, or a woman talking about a woman.

14  There's a little bit of that that's a little concerning to me.

15       What's much more concerning to me is that, this is

16  background that I want to know, that I need to know, before I

17  would put heavy emphasis on this.  When I got this report, I

18  looked at it and I read it and I said, in short, Who the hell

19  is this?  Because it doesn't -- there's no letterhead.  There's

20  no?  Very similar to my question.

21       *THE COURT:*  There's no nothing.  It just starts

22  talking, and it isn't until the very end that you see the name,

23  and as hard as it is to believe, I'm not necessarily the most

24  informed person with respect to news, and so I saw the name and

25  it meant nothing to me.  So I Googled it, not meaning that I

1    accept anything that's on the Internet as true, it at least

2    gives me some basis to see what's going on and I saw the things

3    that you are talking about, which is that there's noise about

4    him.  I'm not going to side in on the political debate that

5    surrounds him as to whether he is or isn't this, that or the

6    other.  My concerns are different.

7           When Ms. Conley was speaking to the FBI and describing

8    how she came to her religious understandings, she mentioned

9    that -- she mentioned al-Awlaki --

10          *MR. HOLLOWAY:*  Yes.  Anwar al-Awlaki.

11          *THE COURT:*  Yes.  Was amazing.  She also mentioned a

12   couple of websites that she would use, one of them being, the

13   way the FBI put it, muslimmatters.com, and that is incorrect.

14   It's muslimmatters.org, because when you put in dot com it

15   redirects you to dot org.

16          In my looking at Mr. Elibiary, I found out that

17   several of his statements, positions, papers, have been put

18   forward on muslimmatters.org.  To be clear, that is not

19   anything other than a -- to my view -- a mainstream -- I didn't

20   read everything that's on there.  I don't have any expertise in

21   it, but I saw nothing that suggested it was anything other than

22   a cite to talk about things that matter to Muslims.

23          But there are things of his that were on there,

24   including his statement, an article that al-Awlaki should not

25   be executed or killed by the United States, but should be, in

1   some way captured, and we work out something with the Yemeni

2   government with regard to him.  As well as the fact that ISIS

3   has grabbed his statement about a caliphate being inevitable.

4           So I'm sitting there and I am saying to myself, I

5   don't know what to do with this.  His words are where she was.

6   Is this -- is he too close?  I don't know the answer.  Has she

7   looked at some of these things, and he is on both sides of the

8   fence.  I don't know the answer.  There's more that I don't

9   know, than I do know.  I take it for what it's worth, but

10  there's a part of me that says, He is not someone to be

11  dismissed, because after all it does seem as if Homeland

12  Security and the FBI and others did rely on him, but it is also

13  the case there's a certain element of nephrology going on here

14  where it's, sort of, I can feel you, squeeze you, touch you,

15  tell me whether or not you are a radical or not, and I am not

16  sure -- well, I am sure -- I'm not willing to defer to anyone,

17  whether it be that expert or anyone else, that judgment will be

18  made by me.

19          MR. HOLLOWAY:  Certainly.  I think the Court has more

20  eloquently honed in on a lot of the concerns that I had when I

21  read it at the eleventh hour, and the one thing that I want to

22  make absolutely certain of, is not to serve as some way to

23  anoint him as some expert, especially given the questions that

24  are floating around out there, and having him not be subject to

25  any sort of scrutiny, in terms of Cross-examination or anything

1    like that.  And so, you know, that's my read, having received

2    that report quite late and my view on that.  I really agree

3    with the Court.  I don't think he is in a position to opine one

4    way or the other about this case or about whether or not

5    anybody is a violent radical extremist.  I just don't.

6    Especially given the apparent lapses in his factual analysis,

7    and the questions about what sort of bias he may or may not

8    have, and so that -- that is what I had asked the Court's

9    indulgence on, that I referred to when the Court inquired of

10   me.

11             *THE COURT:*  I understand.

12             *MR. HOLLOWAY:*  Importantly, here, one of the biggest

13   things that I think needs to be considered are concepts that I

14   think are interrelated, with regard to deterrence and

15   protection of public.  You know, unfortunately recent history

16   gives us too many examples of people who, obviously, have

17   whatever difficulties they have, and then they radicalize to

18   violence, and we all know that.

19             And as I indicated in my briefing, I think all of us,

20   at least I do, I try to have, sort of, this basic faith in

21   human nature that encourages us not to automatically, jump to

22   these kind of horrific conclusions; right?  But that being

23   said, with the job that I am charged with, the protection of

24   the public, compels me to take a view that considers those ugly

25   possibilities, and given the significant amount of attention in

1  this case, I think it is extremely important and significant

2  for purposes of deterrence to show that while the Government

3  will appropriately operate with restraint, there is also a

4  price that needs to be paid when you insist on voicing and

5  taking action to do these things that are frightening.  I mean,

6  she didn't simply just make statements.  She set about to -- to

7  effectuate those things, and as we told her, it's a crime, and

8  we were forced to arrest her, and it's an important deterrent

9  message to send, to give her a sentence of 48 months, to let

10  others know, who may be contemplating saying outrageous things

11  from whatever motivation, right?

12        THE COURT:  No, no, no, no, no.  I understand where

13  you are going, and I will let you get back to it, but in this

14  country you have the right to express unpopular, ridiculous --

15        MR. HOLLOWAY:  Exactly.

16        THE COURT:  -- or other views --

17        MR. HOLLOWAY:  If the Court would let me finish.

18        THE COURT:  -- in the area of race and gender and

19  sexual preference --

20        MR. HOLLOWAY:  I understand.

21        THE COURT:  -- religion.  These things occur more

22  often than in other countries.

23        MR. HOLLOWAY:  No.  I understand, and agree

24  completely.  The Court cut me off in saying -- saying these

25  things and following them, with actions that compel the JTTF to

1  effectuate an arrest.

2        *THE COURT:*  I just want to be clear we are on the same

3  page.

4        *MR. HOLLOWAY:*  We are entirely on the same page.  And,

5  in fact, the way that we conducted ourselves in this case

6  shows, unequivocally, that we are on the same page.

7        We agree.  People have a right to say whatever it is

8  they want to say, within the confines of the law, and when

9  those statements then move into action, that is harmful, and

10  that is a crime, then we will be forced to invoke the

11  apparatus, in order to protect the public, and that's again, I

12  apologize for not speaking more quickly, perhaps.

13        *THE COURT:*  Well, I have a tendency to butt in.

14        *MR. HOLLOWAY:*  Well, just trying to ... the other part

15  of this is what I've explained to the Court, no matter the

16  motive, right, the significant attention on this poses a danger

17  that somebody else may say, "Hey, this is a neat way to get my

18  15 minutes of fame," and it's unacceptable.  It's absolutely

19  unacceptable.  Because what Ms. Conley did was a crime, and it

20  is something that -- that we need to take seriously and we need

21  to take action, and -- and so the sentence imposed in this case

22  is important, as a deterrent affect.

23        The other thing that goes hand-in-hand with

24  deterrence, obviously, is protection of the public, and it's,

25  something, unfortunately, that we have to struggle with, here,

1    because it's going to be an imperfect process.  Especially in

2    this case, it's going to be imperfect, because there are all

3    kinds of mixed messages, right?  You know, I'm -- I'm charged

4    with making sure nothing bad happens, and at the same time, we

5    are all charged with effectuating justice and being fair and

6    operating with restraint, and we're trying to look at this

7    Defendant specifically, with whatever issues or problems she

8    may have or have not, and predict what will happen in the

9    future.

10          And where I come out on it, as the Court has observed,

11   I did not come out at a 2339B with a sentence of 15 years, but

12   at the same time, it does not warrant a sentence of 12 months,

13   and a day.

14          THE COURT:  Which basically means --

15          MR. HOLLOWAY:  Nothing.

16          THE COURT:  -- out in a couple of weeks.

17          MR. HOLLOWAY:  Yes.

18          THE COURT:  I didn't say Nothing.  I said, Out in a

19   couple of weeks.

20          MR. HOLLOWAY:  Well, that's correct.

21          The difficult thing is that in spite of those efforts,

22   for whatever reason, Ms. Conley has posed a conundrum, in that

23   at times she is engaging and intelligent and indeed cooperated,

24   but then at the same time, demonstrates a defiance towards

25   authority and a vitriol that demonstrates a lack of respect for

1  the law that we saw when we were trying to say, Hey don't do

2  this.  Don't, please do not do this.

3      THE COURT:  Let's pull some of the layers off the

4  onion here.  That woman is in need of psychiatric help.  I'm

5  not saying for a moment that she has a psychotic condition.

6  I'm not saying for a moment that her decisions here were the

7  direct product of a mental illness.  And I think that those are

8  the conclusions that the doctor's reports say to me.  But she

9  is a bit of a mess, and if you time lined out from 2011, when

10  she is in the teen police academy, to April of 2014, when she's

11  under arrest, this is a history of events that would make for a

12  bad movie, because you would not believe that for -- that

13  someone would, over the course of six months, have three

14  different times considered marrying somebody that they only met

15  over the Internet.

16      MR. HOLLOWAY:  And the Court is absolutely right, and

17  I agree.

18      THE COURT:  And I am just touching on the tip of the

19  iceberg.  So the question to you, is, and you have had the

20  benefit of seeing the psychological and psychiatrics, and you

21  know that I'm just touching on the tip of the iceberg, why

22  shouldn't I take that person and try and help her in the areas

23  where she needs help, more than put her away for the maximum of

24  time -- amount of time that the Government wants?

25      MR. HOLLOWAY:  The Court should incarcerate her for 48

1  months, because that's the place where she can get that

2  treatment that she needs.

3        THE COURT:  Come on.

4        MR. HOLLOWAY:  She has -- she has, on her own, without

5  that kind of structure, refused to follow recommendations.  She

6  has --

7        THE COURT:  I --

8        MR. HOLLOWAY:  -- she refuses to answer to direction.

9  She has refused to comply her behavior to the law when directly

10  told.  And if I had any confidence that she would follow her

11  treatment regimen out on her own, I would consider that, but,

12  you know, I want the Court to understand, I don't reach this

13  recommendation lightly.  And the Government, again, has gone to

14  great lengths to not only show restraint, but recognize the

15  difficulties that the Court is asking me to do an analysis of,

16  and, you know, I won't pretend that I'm a psychiatrist, but --

17        THE COURT:  And I won't pretend that I send people to

18  prison so they can receive mental-health treatment, that's not

19  what it's about.

20        MR. HOLLOWAY:  No, it's not.  It's about mental-health

21  treatment and deterrence and the nature and circumstances of

22  the offense and the protection of the public.

23        THE COURT:  And the other factors.

24        MR. HOLLOWAY:  And it's all of those things together,

25  and I -- and you are not going to hear me, on my case, stand

1  here and pretend that it is an easy calculous.

2       THE COURT:  What am I to do with the psychiatrist

3  report that says, She is not a terrorist?

4       MR. HOLLOWAY:  Well, I think the psychiatrist, similar

5  to the other expert, her area of expertise, with all due

6  respect to her, I think the report was thorough, and it was

7  careful, but she is not equipped to determine whether or not a

8  person is a terrorist.

9       THE COURT:  And of course, you recognize that my

10  decision here today is not to decide whether she is a terrorist

11  or not.

12       MR. HOLLOWAY:  Exactly.  The decision here today is to

13  determine what sentence provides deterrent, promotes respect

14  for the law, provides adequate deterrence, factors into account

15  the nature and circumstances of the offense, and it provides

16  for the needs of treatment, and again, you won't hear me

17  pretend that that an easy calculous.

18       THE COURT:  But it would be a much easier calculous if

19  she were a terrorist, wouldn't it?

20       MR. HOLLOWAY:  Well, at this point I don't know --

21  well, I don't want to, you know, bolster myself too much.

22  Perhaps I'm better equipped --

23       THE COURT:  You crossed that line a long time ago.

24       MR. HOLLOWAY:  Certainly in questioning of whether or

25  not a psychiatrist can make a determination as to whether or

1    not somebody is a terrorist, they are not equipped to do that.

2    I know that I have spoken to more terrorists than Dr. Bograd

3    has, and I have probably spoken to more terrorists than anybody

4    in this room, but, you know, the jury is still out on

5    Ms. Conley, and so I don't think that's the proper analysis of

6    whether or not she is a terrorist.

7         *THE COURT:*  I don't think it is either.  I mean if --

8    it is a relevant consideration, but that's not what this is

9    about.  It's not -- it's -- it's not an irrelevant

10   consideration by any means, but I am not here to decide, You

11   are a terrorist, You are not a terrorist, I am not here to say,

12   necessarily, that I know what's going to happen with you, two

13   years from now, three years from now, four years from now.  To

14   the extent that I'm comfortable making a prediction about that,

15   it would, obviously, impact which direction I go here, but this

16   case has a -- as I said at the outset, an ability to kind of

17   move down the beach in all of these strange directions where

18   all of a sudden it becomes with a be all and end all of

19   sentencing of whether or not she is a terrorist.  That may be

20   the be all end all of the headline, but it doesn't have much to

21   do with what's going on here, except to the extent that it is a

22   relevant factor, but not a determining factor in all of the

23   complicated decisions that I have to make in this case.

24        *MR. HOLLOWAY:*  I understand that, but I think that the

25   Court has hit on the determinations that the Government

1  factored when this investigation began.  If I didn't weigh

2  those factors when this whole thing began, again, we would be

3  standing here, under a violation of Title 18, 2339B, and

4  arguing about 15 years.

5          THE COURT:  Which still could have been below the

6  guideline.

7          MR. HOLLOWAY:  Yes, it would have.  And so, you know,

8  opining in this particular case about whether or not Ms. Conley

9  is a terrorist, I think is a red herring.  The analysis is the

10  process of radicalization, that we stopped, that we attempted

11  to stop earlier before she committed a crime, and that she

12  insisted on pursuing, and evaluating that behavior through the

13  lens of the factors that we are required to consider.  And as

14  the Court has pointed out, you know, I have talked about the

15  ones that -- that the Government believes are critical in that

16  evaluation, and that is the seriousness of the offense, the

17  deterrent affect, the sentencing that this Court is going to

18  engage in, the protection of the public, and the needs of the

19  Defendant.  And in going through that entire calculous, I come

20  out at 48 months.

21          THE COURT:  Look, I'm prone to making facial

22  expressions.  In other context I have said that I share

23  similarities with babies, and that sometimes it's just gas,

24  but...

25          MR. HOLLOWAY:  I hope you are not saying I'm gassy.

1          *THE COURT:* But I have also -- well, let's not go

2     there.

3          I smile because you keep limiting the factors, the

4     3553(a) factors, to those that you are comfortable with, and

5     I'm not saying that those factors are not significant factors.

6     There are others as well.

7          *MR. HOLLOWAY:* If the Court wants to ask me about the

8     ones I'm uncomfortable with, I'm more than happy to go there.

9          *THE COURT:* What about the nature and characteristics

10    of the Defendant?

11         *MR. HOLLOWAY:* The nature and characteristics of the

12    Defendant are encompassed in this analysis that I'm talking to

13    the Court about, of -- I described it in my pleading as

14    pathologically --

15         *THE COURT:* History and characteristics maybe the

16    actual term used,  but go ahead.

17         *MR. HOLLOWAY:* And that's also a little difficult

18    here, Your Honor, because you have wanted to keep us focused

19    on --

20         *THE COURT:* I understand that, but she is also a

21    consideration.

22         *MR. HOLLOWAY:* Yes, she is.

23         *THE COURT:* I just don't want it to become improperly

24    attached to the offense.  The offense is a separate

25    consideration.

1        *MR. HOLLOWAY:*  I understand that.

2        *THE COURT:*  And so I'm asking you -- I mean there

3    are -- there's strange stuff with her.

4        *MR. HOLLOWAY:*  I described it as oxymoronic, right?

5    You know, on the one hand she is engaging and intelligent and

6    on the other I am -- the best way I can describe it is

7    pathologically naive.  The idea that she would go over to Syria

8    and it would be all moonbeams and gumdrops is -- is absurd, and

9    so, still to this day, sort of the -- the kind of strange

10   defiance and sort of vitriol towards the jail guards, vitriol

11   towards all to this process.  But it demonstrates this sort of

12   odd thing that I find myself in, whereas, on the one hand she

13   is quite pleasant and cooperative, but on the other hand

14   expresses things in communications which indicate this defiance

15   towards authority that I find quite strange, because we have

16   been trying to give her every benefit of doubt, but yet there's

17   still this -- this behavior that still prompts a concern

18   about -- about public safety.

19        I mean I -- you know, I expected far more contrition.

20   I expected a stronger -- a stronger understanding of the

21   gravity of the situation, and I don't understand why I don't

22   see it.  And so, yeah, the nature and characteristics of the

23   Defendant, they do come into play, and you are right, I'm not

24   as comfortable with that, because I'm not a social worker and I

25   am not a psychologist, and I try to have empathy.  There are

1    many who probably think I don't, but I attempt to exercise an

2    empathy, or understand, to the extent that I can, you know,

3    what somebody may or may not do.  Unfortunately, I'm stuck with

4    the facts as I see them, and again my overarching

5    responsibilities about protecting the public and pursuing

6    justice.  And again, I'm not going to tell the Court it's an

7    easy analysis.

8           So I'm ready for the next factor that I'm

9    uncomfortable with.

10          THE COURT:  Well, I don't know that you're

11   uncomfortable with anything, because it seems to constantly

12   turn back to what a wonderful job you have done.

13          MR. HOLLOWAY:  Well, I hope to.  I hope to.

14          THE COURT:  Well, take that in the spirit in which

15   it's given.  She has no history in the criminal justice system.

16   This is the first offense.

17          MR. HOLLOWAY:  I understand.

18          THE COURT:  She is very young, and to be blunt about

19   it, you know this, if you don't, when your children reach that

20   age, you will know this, teenagers make dumb decisions, a lot.

21          MR. HOLLOWAY:  I think Ms. Conley's parents would

22   establish that I made that observation myself, already.

23          THE COURT:  See, it all goes back to you.

24          MR. HOLLOWAY:  Well, I mean, Hey, I'm a lawyer, I

25   suppose.

1      *THE COURT:*  All right.  Fair enough.

2      *MR. HOLLOWAY:*  But what I will say, is that ... it

3   cannot be ignored that there are people who do not have

4   criminal history who are very young, who have engaged in

5   behavior, most recently, that is terrifying.  The woman being

6   sought in connection with the shootings in Paris is young, and

7   has no criminal history.

8         I'm not saying that Ms. Conley is going to do that,

9   and that's why the Court understands my hesitation, because I

10  try to be as objective as I can about this, but since the Court

11  inquired, I'm going to make that observation.  And so while I

12  appreciate, again, she is young, she has no criminal history,

13  sadly, she was saying and doing all of the things that forced

14  us to respond, and now, unfortunately, current events have

15  demonstrated why a response is absolutely necessary.  And

16  again, I'm not going to say it's an easy decision.

17     *THE COURT:*  I agree with you on that part.  I don't

18  have any other questions for you.

19     *MR. HOLLOWAY:*  Very well.  Thank you very much,

20  Your Honor.  I appreciate it.

21     *THE COURT:*  Mr. Pepin.  And what I think I will do

22  here is take your comments, sir, and then I will ask Ms. Conley

23  to join you, and take her comments.

24     *MR. PEPIN:*  Thank you, Your Honor, that -- that works

25  for me.  Should I just go ahead and wait for your questions.

1          *THE COURT:* No. You won't have to wait. Just start

2     going. Let's pretend that I'm going let you talk.

3          *MR. PEPIN:* All right. I have known better than that

4     for a good long time.

5          So I guess part of the question is, Where to start? I

6     knew where I was going to start until the exchange with

7     Mr. Holloway.

8          So I think I will go ahead, for a moment, and touch

9     bases about this Mr. Elibiary. I hope when my pleadings said I

10    just received the report, you understood that it was not my

11    choice to file it then. I apologize.

12         *THE COURT:* I understood that.

13         *MR. PEPIN:* You know, I wasn't going to do this,

14    generally, but if I could give you a little bit of a structure

15    as to what it's been like to work with this case. I don't mean

16    work with -- with Ms. Conley, because that's been a delight.

17    But to work with this case, because I am an American too. I

18    have concerns about the public and its protection. I'm worried

19    about deterrence. I have all of the same problems and concerns

20    that everybody else does. And I knew from the beginning that

21    one of the concerns that everyone would have, I mean not only

22    do I know the sentencing statute, but there's a practical thing

23    people are going to be concerned about what might happen in the

24    future. Where is this young woman, really, in terms of -- I

25    mean, Is she a crazy radical? Is she sort of a radical? Is

1   there such a thing as, I thought of is radicalization

2   continuum.  I don't know.  How do I know these things?  I don't

3   think anybody really knows, knows these things.  Are there

4   theories out there?  Are there thoughts about how this can be

5   maybe dealt with?  And who might talk to me about it?  And,

6   what about within -- I mean, I didn't know a single thing about

7   Muslim society, Islam, nothing, not that I know much now, but I

8   knew nothing.

9          And my attempts to reach out into the local community,

10  were met with, I just didn't get much in the way of response

11  and the attempts were many, and they were varied, and including

12  going to forums and a variety of things.

13         I hoped to get people who could come and talk to

14  Ms. Conley, because I didn't know where she was in this.  I

15  didn't understand it.  I was hearing what she was telling me.

16  And so we reached out to an area where there was -- we learned

17  there was someone who had worked with the President's council

18  on how to address questions like countering violent extremism

19  which is CVE, which is -- it's the area -- after I learned

20  something about it, I'm hearing it on the radio too.  I have

21  been hearing interviews by people in the Administration,

22  Homeland Security people, because there is now and it's a

23  fledgling still, which I think is still very important here

24  with regard to Ms. Conley.  There is now an attempt, and I

25  think it's been going on for awhile, but fits and starts, and

1  how do you do it?  Where do you do it?  To what degree can it

2  happen?  There's this effort, concerted, and I applaud it, and

3  I think this was part of it, an effort to figure out how to

4  address these kinds of issues, and of course this stuff has

5  redoubled since these last horrific bits of information we have

6  learned about ISIS and the people flocking there, and concerns

7  about all of that from this country and other countries, and

8  frankly we were trying to get purchase, how do we find a way to

9  get some sort of idea?  Who can talk to her about where she is

10  in this.  I mean is she -- and this gentleman, Mr. Elibiary had

11  worked in this area, actually knew at least one of the players

12  who was involved in this, because of a longstanding connection

13  with him.  Had been involved with teaching the FBI agents.  He

14  made reference in that report to-

15       THE COURT:  The player you are talking about is the

16  agent.

17       MR. PEPIN:  I'm sorry.  That's right.  The agent who

18  came up from -- who -- who also -- this is part of what I

19  learned, part of it talking to him, part of it reading on my

20  own.  The reality is that if you have someone who is

21  radicalized, whose voice in the ear, whose vacuum in terms of

22  knowledge, especially a convert, especially somebody who hasn't

23  had any other real basis within the religion, isn't an

24  emigrant, who comes here with a family of Muslims, who have

25  generations of it, that there are these gaps in information, an

1    ability to learn.  You don't have to go through a confirmation

2    process.  You don't have to go through some sort of Jewish --

3    um ... absorption of the religion.  You don't have to be

4    confirmed.  You don't have to have the Bar Mitzvah.  You don't

5    have to do any of that stuff.  You say, I'm a Muslim, and you

6    are a Muslim.  There's a certain way to say it.  It's the right

7    way.  It's one of the pillars of the religion.  It's

8    exceptionally important, but it doesn't take much more than

9    sitting in front of the computer and reading the words, and

10   then, without any basis of knowledge you sort of enter that

11   world.

12         So the world at that point, for Ms. Conley, was filled

13   by what was going on online, and what is going on online, and I

14   have listened to some of the tapes, and what you have,

15   Your Honor, is you have this world where there are people who

16   know more than you, lots more than you, who are exceptionally

17   well versed in how to communicate their perspectives, someone

18   like Anwar al-Awlaki, for instance.  He had 13 tapes or disks,

19   or something, that talked about all of the different aspects of

20   your life.  Didn't even touch on jihad in those areas.  All of

21   these different aspects in your life.  He talked about it with

22   the FBI.  Ms. Conley did.  She told them that she had received

23   these 13 disks about him from one of her friends.  Those didn't

24   deal with jihad.

25         Those dealt with, you know, what do you do in a

1  marriage?  How do you live your life?  How do you dress?  How

2  do you do this?  How do you do that?  How should you approach

3  your religion?  And it sounded exactly like the kind of guy who

4  knew what he was talking about, and on top of everything else,

5  spoke English, sounded like he was from the states?  Very easy

6  to understand.  Much different, by the way, than many of the

7  folks who were doing the teaching and leading the services in

8  the local mosques, because many of them are, for all practical

9  purposes, lay people, who have some knowledge, who are helpful,

10  but they are working three jobs while running -- teaching the

11  services, these imams.

12        So there's this filling of this vacuum with this

13  information from someone like Anwar al-Awlaki.  And so when he

14  is then online, after you have already listened to his stuff,

15  and he is, you know, putting stuff out through Inspire

16  Magazine, which, I mean, you have seen a little bit about that

17  in our pleadings, if nothing else, and he is talking about

18  violent jihad, and he is talking about the necessity to go off

19  and defend Muslims and what it's going to take, and that

20  becomes -- that, and then you are talking to people online,

21  because young folks are always online, always online, and

22  that's where they are getting so much of their information, and

23  that's what your base of information is, to have?

24        I mean, it's like you are sitting there in a -- in a

25  tank, and to have a well-meaning FBI agent come up from Texas

1  for a day, and drop in and say, You shouldn't be looking at

2  things that way.  Here, look at these verses, and then you go

3  back and you ask the people online about it.  This is all stuff

4  she told the FBI she did.  And you ask people online about it,

5  and they say, That's not how you look it.  You look at it

6  differently.

7        Now, how is it that what Mr. Elibiary is saying is so

8  crazy that you need to be -- you need to have credibility, to

9  be someone who can actually break through that tank wall.

10  What's wrong with that perspective?  I'm not saying that

11  he should -- that you like the report, liked the timing of it,

12  or anything like that, but the notion that he is -- that what

13  he is saying is absurd; that somehow or another, sort of,

14  laughing at the fact you have to be radical enough to be able

15  to get through.  You have to understand it.  You have to have

16  credibility.  You have to not necessarily be a Government agent

17  coming up for a day.

18        *THE COURT:*  All right.  Let me ask this, because

19  there's something that you are not saying, and I recognize that

20  you are not saying it, but, man, you are coming close, and

21  that's this; there is this perception that if she was, out of

22  naivety, stupidity, youth, all of the above, some of the above

23  none of the above, came to believe that her religion said,

24  "Okay, this is okay," that that means I should treat it more --

25  I should treat her more favorably, and I'm sitting there and

1    saying, to myself, all right, your -- you may believe that your

2    religion requires X, there may even be some species of religion

3    that I'm not familiar with, that require -- that says you

4    require X, that doesn't change it.  The law is the law.

5         MR. PEPIN:  No.  No, Your Honor.  And I am sorry --

6    there is no way in the world I would say --

7         THE COURT:  I know you are not saying it.

8         MR. PEPIN:  I'm not trying to suggest it.  I'm not.

9    What I'm saying -- what I'm trying to say it fits in a much

10   bigger picture, I think; and that is that I'm not afraid to

11   talk about protecting the public, not supposed to be one of my

12   areas, but I'm not afraid to talk about it, or how that fits

13   with the deterrence or how that fits with her history and

14   characteristics, and the facts and circumstances of this

15   offense.  I think it all fits into the package.

16        I think that one of the things that I keep hearing,

17   and I don't know in the end maybe you will rely on it to some

18   degree or another, is that she was told and she did it anyway,

19   and I know that's against the law, and I understand there need

20   to be repercussions.  Our position is there has been a heck of

21   a one, whether you let her out at this second or not, but there

22   needs to be context of what we're looking at, of her history

23   and who she is.

24        THE COURT:  It's more than that.  It is this strain of

25   defiance that rolls through her life, I don't see changing yet.

1   It's not just, You were told.  It's that you show up for the

2   first meeting with the FBI, and either are -- decide to wear

3   this T-shirt or don't remove this T-shirt, that says, Sniper,

4   don't run.  You will die tired.  That's defiance.  That's

5   basically saying, I will meet with you, and you are just... go

6   ahead, but I'm not going to hide what I am, and I don't care

7   what you think.

8        Her parents tell her, You can't.  It's not just the

9   FBI.  The FBI said, No, you can't do this.  It's against the

10  law, in unmistakable terms.  I would rather go to prison than

11  do nothing.  Her parents say, You can't go, and it's not just

12  she sneaks off; it's defiance, I'm going to leave the ticket on

13  my father's desk so that he can see it. Screw you dad.

14       It's the psychiatrist picks up on it as antiauthority.

15  There is this strain of defiance that is there, that precedes

16  the conspiracy, and that to some extent continues now.  I don't

17  care if she doesn't like guards.  That's not --

18       *MR. PEPIN:*  I hope not.

19       *THE COURT:*  That's nothing to me.  But there is this

20  curious, bizarre notion that -- look, I'm not saying that man

21  is a teddy bear.  I'm not even saying he is worthy of being

22  liked, but when you know that the Government is taping and

23  listening to everything that you are doing, everything, and

24  reading every piece of mail, to be basically throwing names,

25  defiance in his direction, don't need to get into the

1  particulars --

2        *MR. PEPIN:*  Do you mind if I address that for just a

3  minute?

4        *THE COURT:*  I sure hope you do, because I'm not

5  looking at this as necessarily involving this singular simple

6  way to simplify question of, Is she a terrorist bomber?  I

7  probably could get to the end of that pretty quickly.

8        My question is, is there -- is there -- you are saying

9  to me now, She is not what she was, and I see character and

10 traits and things that -- that are on both sides of this and

11 they concern me.

12       *MR. PEPIN:*  Well, what I'm saying -- and I -- you

13 characterize it correctly, although -- it's not -- it's not

14 just that she isn't what she was.  The things that she believed

15 and articulated, she doesn't believe now.  She has gone

16 through, in nine and a half months, a growth process.

17       Your Honor, I know that when someone, for instance, is

18 arrested, it may jolt them into a view.  It may wake -- shake

19 them and wake them up, and that's the way, sometimes, we think

20 about those kinds of things with kids or with people charged

21 with things.  That's not what happened here.

22       What happened here is that basically some, like a

23 creator or something reached thumbs under her skin, ripped it

24 inside and out and left her body and soul wide open, and that's

25 the change that has happened to her because --

1          *THE COURT:*  Go ahead.  I understand the emotion.  Go

2   ahead.

3          *MR. PEPIN:*  This defiance thing, I understand what you

4   are saying about the T-shirt and all of that, but here is what

5   drives me crazy about this, I cannot begin to count, I'm sure

6   they are countable, the number of hours Shannon Conley sat and

7   talked to her parents on the phone.  Hour after hour, day after

8   day after day, on the phone, on the little video, I mean

9   they -- it's all recorded.  Every bit of it.  Every stinking

10  word is recorded.  Every letter she wrote is recorded.  And

11  there's good things about that, and there's bad things about

12  that.  And the bad things about it are, that you know what if I

13  am mad at you and go home and talk to my wife about it and use

14  a name referring to you --

15         *THE COURT:*  You may.

16         *MR. PEPIN:*  -- you probably would expect it.

17         *THE COURT:*  I would.

18         *MR. PEPIN:*  And if I were -- if I felt someone had

19  done something wrong to me or if I'm having a bad today or

20  something else, and I go back to the office and complain about

21  it to the person in the office next to me, you would expect it.

22         Shannon Conley is sitting in a jail for months and

23  months and months and months, and talks to her parents for

24  months and months and months and months, and writes letters for

25  months and months and months; lots of them.  And during that

1   period of time, there were times when she would be frustrated

2   or upset and the course of conversation -- with her parents --

3   would do a thing that apparently she is the only one who isn't

4   allowed to do; and that is, to use a word or something to refer

5   to a particular jailer, or to be upset because the prosecutor

6   didn't -- didn't -- thought she needed to stay in jail instead

7   of get out on bond.

8           I mean, I'm sorry, but the words that she used, and I

9   said this in my pleadings, we've all done this for awhile, if

10  that's the words she used, Holy bajoly.  I mean, that's -- it's

11  practically nothing by comparison.  It's not out-and-out

12  defiance.  It's being frustrated; it's being upset; it's not

13  being happy with a particular situation.  The guards have

14  complete control over your life, and so if she ends up talking

15  to the people she can talk to about that, because everyone is

16  listening to exactly what every single word she is saying, then

17  she gets whacked up the side of the head.  It's labeled

18  defiance.  I understand its in context of previous stuff, I get

19  that, but it's labeled defiance, and it fits the same way with

20  other aspects of this whole situation.

21          I mean, for instance, I don't know, I mean,

22  fraternizing with criminals in jail.  Getting along with them.

23  I'm sorry, but please.

24          THE COURT:  And look, I get that, but you are missing

25  the point that I'm making, which is, defiance has been a part

1    of her fabric for a long time.  And in the context of this

2    crime, and that degree of the defiance, it is concerning.  She

3    has been defiant before this.  She has done things with her

4    family that showed defiance.  This is not the exceptional act;

5    the aberrational act.  This is Shannon being defiant, yet

6    again.  And so why should I believe that this defiance all of a

7    sudden washed off like dirt from a shower.

8          *MR. PEPIN:*  It didn't wash off, Your Honor.  It was

9    yanked off of her.  I mean this -- she has -- what has she

10   experienced before like this?  I mean what -- I understand that

11   there was a time when she had -- I mean there was reference to

12   a comply, for instance, with the mental health stuff.

13         *THE COURT:*  Yeah.

14         *MR. PEPIN:*  We all know the influences there.  There

15   were multiple, right?  And so you know there's -- there are --

16   there was no such thing as a Court Order.  It was voluntary.

17   It was all -- all of that stuff.  Please --

18         *THE COURT:*  The runaway?

19         *MR. PEPIN:*  Yeah.  I mean there are runaways.  I'm not

20   saying there wasn't defiance.  What I'm saying is the place she

21   is in right now -- I mean the other thing is this, in 43 pages,

22   that's just Dr. Bograd's part, that's not Dr. Post's part of

23   the psychological evaluation, in 43 pages, her soul was laid

24   bare.  I mean she got confronted with it right upfront.

25   Frankly, with a woman that she liked, and dealt with her for a

1    number of hours.  And in spite of the fact -- well, I mean

2    number one, it talks about that report.  Talks about defiance

3    and vulnerability and steps that need to be taken to deal with

4    it.

5         THE COURT:  And there's a species of defiance and

6    manipulation telling people, Don't worry about it.  I'm not

7    going to show my hatred to the psychiatrist.

8         MR. PEPIN:  But I'm going -- right now I would like to

9    address that if I can, Your Honor, because let me tell you

10   where that came from, and I'm, frankly, furious about it.

11        THE COURT:  All right.

12        MR. PEPIN:  Here is the situation, the things that

13   people were looking at, and those multiple things they were

14   looking at, and the letters and things they were looking at,

15   they included the reference that Shannon made, to me, going to

16   her, after I had seen how frustrated she got with the guards

17   and stuff, and counseling her like I would my 19-year-old

18   daughter about how, If you are going to be talking to people,

19   don't let the frustrations of your day, you know, whatever is

20   upsetting you, get the best of you and you start throwing a

21   fit.  She had gone in and talked to Mr. Holloway and was upset

22   about her handcuffs and the name on them, kind of gave a little

23   hissy, I was explaining to her she shouldn't do that.  That's

24   what she was talking about.  And frankly, I understand that

25   everyone -- people are latching on to those things.  But that

1   was not her saying I'm going to try and trick the psychologist.

2   I mean it was not it at all.  That's where that came from.  I

3   was the person who said it.

4        THE COURT:  Okay.  What am I to do with this, frankly,

5   obsession with the military, which no one talks about?  And let

6   me lay it out for you so you know exactly what I'm talking

7   about, then you can come back at me.

8        MR. PEPIN:  You bet.

9        THE COURT:  I look at this, and I say, Hm, one time

10  she wanted to be a law enforcement person, okay.  Kids want to

11  be all kinds of things.  I get that.  Then she tried to join

12  the military, or at least expressed an interest in trying to

13  join the military.  Then that doesn't work, because they, as I

14  understand, won't let her wear the hijab.  Then as a substitute

15  for that, she joins the Army Explorers, which I tend to agree

16  with you is sort of Boy Scouts with big ambition, but

17  nonetheless, it's all that's open to her.

18       Then she ends up wanting to go over to Syria, and

19  perhaps it's because his interest in jihad is the same as hers.

20  But in another respect, he is attractive to her, because he is

21  a soldier.

22       And even now there are these odd, odd comments that

23  she makes.  You sign, Letters Behind Enemy Lines.  It's

24  bizarre.  And in one of the letters that you gave me, she said

25  the following, I love studying religion, language and other

1   cultures.  I yearn to travel the world and bring back to my

2   community ways I have found to improve their lives.  I have a

3   fulfilling interest in teaching what I know.  To knowledge

4   hungry students.  And here is the part that I find strange, And

5   I find the moral integrity of the 40s/50s and military training

6   comforting.

7         First, the 40s and 50s, I can look at that a couple of

8   different ways, but make no mistake it was the time of massive

9   war.  It was also a time that makes me scratch my head because

10   things that she does not believe in, many of them came into

11   fruition during that time period.  For example, there's the

12   protection of Muslim lands, I think the Shaw of Iraq was

13   installed in that timeframe.  I know that the State of Israel,

14   about which she has had some comments, was established and

15   recognized in that timeframe.  I could also look at it as the

16   black and white of Hitler versus the United States, as perhaps

17   that's what she is talking about; but Military Training

18   Comforting?

19         *MR. PEPIN:*  Well --

20         *THE COURT:*  You want to tell me what that means?

21         *MR. PEPIN:*  Well, I -- I don't know for sure what that

22   means, but let me, if I could, you know a little bit about my

23   background.

24         *THE COURT:*  I do.

25         *MR. PEPIN:*  That is, I mean, I know that you were not

1  raised in a military household, I was.  I'm an Army brat, as

2  you know.

3          THE COURT:  I'll give you the brat.

4          MR. PEPIN:  Well, and it fits.  And I spent a little

5  time in the Army myself, respect it, and know -- grew up

6  constantly -- I mean constantly grew up my entire childhood

7  with people who knew, loved and believed in the military

8  culture, the discipline, the order, um, some of them, I

9  suppose, the whole rah-rah bit.  Some of them like the flag.

10 Some of them just like the uniform.  Some of them like to marry

11 a guy in uniform.  My mother was married to a man in a uniform

12 for the 30 years that he wore it.

13         So I personally don't find this as troubling or

14 interesting, generally; but I understand that there is this

15 question as to, How does a girl from the suburbs in Denver,

16 kind of, get this interest?

17         THE COURT:  There's other stray pieces.  If you

18 remember in the early days she is wandering -- not wandering

19 around.  She wants to have a -- was it Saudi Arabia?  It was

20 Saudi Army --

21         MR. PEPIN:  Fatigue shirt or something like that.

22         THE COURT:  T-shirt or jersey, whatever the

23 appropriate term is.  As you noted I'm not an Army Brat, so I'm

24 not sure that I necessarily got it.  But, you know, look, at

25 the end of the day, I'm not sitting here making simple

1  decisions of going, Hm, she is a Jihadist.  She is a terrorist.

2  I'm looking at her across a spectrum of time and finding these

3  things that led her into trouble, and finding that those are

4  longstanding, deep-rooted things, and why should I just say,

5  Uh?

6      *MR. PEPIN:*  Well, I don't know that you just say, Uh,

7  Your Honor, but I do think we put it in the context of the

8  psychiatric report and address the situation that way.  If

9  that -- if that is a concern.  I don't know exactly where they

10  fit.  I -- I think that --

11      *THE COURT:*  But I can't put it in the context of the

12  psychiatric report because I'm talking about things that nobody

13  else talked about.

14      *MR. PEPIN:*  Not specifically the military thing,

15  that's correct.  I don't know -- I don't know where you put

16  that.  And -- and I -- there is an order.  There is -- the

17  comfort in the discipline.  There is a -- a camaraderie, during

18  much of her life she didn't have, just because she didn't have

19  those kinds of relationships with people that you find in the

20  military, that some people can find nowhere else in their

21  entire life.

22      There are -- there are set systems for living, and I

23  mean, you know, you live on bases, and the bases have places

24  you go to eat and you do whatever.  There are all kinds of

25  things that draw people to these perspectives, not to mention,

1  to some degree, not looking for a guffaw here, but patriotism.

2  You know, a sense of being a part of something that matters.

3  And I personally don't find it that unusual.  I sure hope it

4  doesn't mean she gets a jail sentence, or doesn't get a jail

5  sentence, because of her interest in the military.  I know

6  that's not what you are saying, but I don't -- I don't know.

7      THE COURT:  What am I to make of this disavowment of

8  jihad, which, frankly, is more understandable coming from you,

9  than it is from her.  Again, let me explain.

10     It's curious to me that the disavowment, or

11  disavowing, whichever the appropriate verb, doesn't occur when

12  she is arrested.  And it doesn't occur when she is in Denver

13  County Jail, in fact, the information that I have is that

14  someone there goes to mentor her or talk to her about her

15  religion, and that person then becomes concerned, because what

16  she wants to talk about is violent jihad, and this woman is

17  very uncomfortable with it, and then when she leaves Denver

18  County Jail, other women, Muslim, in Denver, go to the mentor,

19  and say things like, She was trying to talk them into accepting

20  her belief.

21     MR. PEPIN:  I --

22     THE COURT:  And then I look at this disavowment as

23  occurring, only when -- because the end of June is not an

24  irrelevant date, only when the lid is lifted on this case, is

25  no longer sealed, and now, all of a sudden, people are

1    espousing their dislike for her.  Part one.

2           Let me give you part two.  Part two is that she tells

3    Dr. Bograd... give me a second to get this thing to pop up...

4    that she doesn't believe in offensive jihad.  Now she believes

5    it's defensive.  By that, she means an enemy is clearly

6    defined, enemy, and if that enemy is attacking you physically,

7    then you can respond in self-defense, and of course that is

8    meant to be a step back.  Certainly was perceived by Dr. Bograd

9    as a step back from where she was.

10          MR. PEPIN:  It's a huge step back, absolutely.

11          THE COURT:  When she was talking to the FBI, quote, it

12   is okay to attack westerners when engaged in defensive jihad.

13          I'm not even sure what she is saying anymore.  I have

14   never heard jihad as personal self-defense.

15          MR. PEPIN:  Well that's -- that would be --

16          THE COURT:  Countries, okay.  But, Hey, I don't

17   believe in offensive jihad, back when she is talking to the FBI

18   it says, Killing westerners in defensive jihad, and in the

19   context in which those conversations with the FBI we're talking

20   about, it was again this notion of protection of Muslim lands,

21   and if I'm going to sit here and say, Okay, well, what am I to

22   do with the fact that the United States is currently involved

23   in Afghanistan and Iraq, and engaging in missions against ISIS

24   and others.  Well, isn't that actual attack?  I mean, is this

25   just gobbledygook or just an attempt to draw lines that are

1    gossamer thin and have no meaning?

2          *MR. PEPIN:*  Well, I think, and --

3          *THE COURT:*  I will now shut up.

4          *MR. PEPIN:*  They are both very different, I think,

5    things.

6          So, let us -- this is going to require some -- some

7    background and some history, that you don't know, and so since

8    you brought it up I'm going to have to go into it.

9          Regarding the incident at the jail, we found, because

10   I told you we were scrambling like crazy to try to find someone

11   who would talk to Ms. Conley about Islam.  One of the things we

12   learned is that one of the most underserved populations, in the

13   local jails anyway,  are Muslim women.  We found a woman who

14   was willing to go into the Denver County Jail, and to counsel,

15   to basically be a -- the -- um -- the religious mentor,

16   contact, someone --

17         *THE COURT:*  I get it.

18         *MR. PEPIN:*  Okay.  To do this we had to go through the

19   chaplain at the jail.  I have laid out, sort of, the problems

20   we had dealing with trying to get religious things to her and

21   all of that, but we went to the chaplain at the jail.  He was a

22   new chaplain.  New guy.  Good guy.  Ms. Morgan-Sherman did a

23   lot of the work hooking that up, and this woman went to the

24   jail and started working, meeting with -- met Ms. Conley and

25   met with a couple of the other women there, as well.

1          Ms. Conley -- I mean, this has to be viewed in the

2     context of this.  Ms. Conley was in jail.  She did not -- she

3     did not the second she was arrested on the tarmac at DIA, jump

4     back and say, Okay, I reject jihad.  I disavow it.  That

5     notion, I mean, that's just silly, because we are talking about

6     somebody who has had this poured into them, and that's what

7     their belief system is.

8          *THE COURT:*  It's less silly for somebody who has had

9     these epiphanies multiple times in her life.  A priest walks

10    down the aisle and all of a sudden she has an epiphany where,

11    immediate change, to Catholicism, which was after she was going

12    to be a Hasidic Jew, she was going to be a Catholic, now she is

13    a Muslim, and she had an epiphany -- or at least she was

14    studying those different religions in sequence, and then she

15    had an epiphany watching television, for God sakes, and all of

16    a sudden the skies opened up and God spoke to her.  So the

17    notion that this woman having an epiphany is not as absurd as

18    the notion of you and I having an epiphany.

19         *MR. PEPIN:*  Maybe not.  I'm hoping that you don't

20    believe that there's a likelihood of that, because that would

21    have been manipulative.

22         *THE COURT:*  Oh, I agree.

23         *MR. PEPIN:*  Okay.  So no one would talk to her about

24    jihad.  She is getting these things stuck in her head and

25    people wouldn't talk to her about it.  There are systems set up

1  in the Islamic communities. It's not someone who can sit there

2  and tell them this is how you are supposed to approach what

3  Mr. al-Awlaki is saying. There weren't systems set up for

4  that, and she was dying to talk about what this stuff was. And

5  so here this woman came in, who sat down with her, talking

6  about other aspects, and one day, when the other women had

7  left, Ms. Conley pulled her aside and said, Can we talk about

8  jihad? And the woman, imam, got very concerned. She didn't

9  know what would or would not be something that would be a

10  problem. This is not something that people in her community

11  like talking about, which is part of the problem. And so she

12  went to the chaplain, and when she went to the chaplain, she

13  said I have got this concern. The chaplain called the FBI.

14  The FBI did what they are supposed to do, but now they are

15  going and talking to these people at the jail who are supposed

16  to be the religious mentors or contacts for Ms. Conley.

17          We talked, Mr. Morgan-Sherman and I -- I'm just --

18          THE COURT: No. Just give me one second.

19          MR. PEPIN: Okay. Thank you.

20          THE COURT: As I said, there's so many pieces of

21  paper, sometimes takes me a little longer than I want to, to

22  find where I want to be. Okay go ahead, sir.

23          MR. PEPIN: Thank you. So we, after this, of course

24  we read this, when we got the reports, and we were upset about

25  it on two levels; one, we were concerned about what may have

1    been said by Ms. Conley; and two, we were concerned, frankly,

2    that we had sent someone in who ended up reporting stuff to the

3    FBI that we didn't think really fit in that context.

4         So let me first tell you that that particular

5    advisory, you may remember when Ms. Conley entered into a plea

6    there was a woman wearing a hijab, a head scarf.  That's who

7    she was.  She came in support of Shannon Conley.  That was long

8    after Ms. Conley was in the county jail.  The imam had come --

9    she came to our office, sat down and talked to us, she said, in

10   fact, and I am paraphrasing, and Ms. Morgan-Sherman can tell me

11   if I'm wrong here, but that basically there was no indication

12   from anyone that Ms. Conley was trying to press with these

13   other people who are supposed to come to her, she was trying to

14   press anybody into believing jihad.  In fact, she had come to

15   her and was asking questions about it.  It made her feel very

16   uncomfortable.  It wasn't a waving the flag.  So, I mean I

17   understand that that report is there --

18        *THE COURT:*  I know what it says, right, which is,

19   After Conley's transfer, the other Muslim female inmates at

20   Denver County Jail told the woman that Conley tried to convince

21   them to agree with Conley's type of Islam.

22        *MR. PEPIN:*  That's right, that's what it says and you

23   know what that meant?  What that meant is, she believes you

24   should pray when you are supposed to pray five times a day.

25   Not jihad.  Your Honor, I'm telling you --

1     *THE COURT:*  I am rolling my eyes, because you read

2  this, the context of this report is about jihad.  It's not

3  about praying five times a day.

4     *MR. PEPIN:*  That does not say jihad on there, though,

5  does it?  It does not say it.  So what you have is this, in the

6  community, generally, I mean like the community in jail,

7  Ms. Conley has repeatedly run into people who say they are

8  Muslim.  Some of them learn to be Muslim in jail and then their

9  adviser left and went off to wherever else or something like.

10  Some of them went to -- or just had never, ever participated in

11  the role.  Some of them don't know how to pray, or aren't

12  praying when they are supposed to, or aren't eating the things

13  they are supposed, or aren't getting the kosher meals they are

14  supposed to, and this is an issue with her, and she would talk

15  to them about it, and that's the kind of information that was

16  being passed on.  It was not jihad, and that's why it doesn't

17  say jihad, because it wasn't.  And that's what imam confirmed

18  with Ms. Morgan-Sherman and I, in our office, face-to-face.

19     *THE COURT:*  Those women told Conley to calm down.

20     *MR. PEPIN:*  Quit telling us to pray.

21     *THE COURT:*  They would have told her to calm down

22  because she was talking about praying?

23     *MR. PEPIN:*  Yes, absolutely.  Quit complaining to us

24  because we are not getting up and praying at 5 o'clock in the

25  morning.

1           THE COURT:  What am I to -- okay.  What am I to do

2   with the fact that there are things about her that make me

3   think she doesn't get it?

4           MR. PEPIN:  What would those be, Your Honor?

5           THE COURT:  She is drawn to attention.  She is a,

6   look-at-me girl.  I'm sure you weren't real happy with what

7   happened yesterday?  With the interview that --

8           MR. PEPIN:  Would you like to hear the story about

9   that?

10          THE COURT:  I want to give you that, everything else,

11  I want to give you the opportunity to respond.

12          MR. PEPIN:  Absolutely.

13          THE COURT:  This is what I mean by she doesn't get it.

14  She writes this letter that you give me that says that -- that

15  talks about again --

16          MR. PEPIN:  Is this one of the letters to someone

17  else?

18          THE COURT:  It's going to take me a minute.  Hold on.

19  Because I want to get it right.  This is the letter that she is

20  writing to her mother, and she is talking about her career

21  plans.  The first thing I mention, but just mention and say I

22  didn't overreact to it, I just kind of cocked my head a little

23  bit saying, really, career plan for 2014 slash 2015,  whenever

24  I get out.

25          MR. PEPIN:  Yeah.

1     *THE COURT:* 2014, 2015, yeah. You know, I'm going to

2   presume that I'm going to be released.

3          *MR. PEPIN:* There's no presumption, Your Honor. These

4   are hopes in trying to plan. We spend, I don't know how much

5   time on my side of the aisle, and I think on the bench, trying

6   to convince people that they need to be looking forward in

7   their lives and try and plan their lives. That document, the

8   one I think you are referring to, is an exceptional indication

9   of her attempting to do that. In fact, she may say 14 or 15, I

10  just really don't get as being a negative.

11         *THE COURT:* What about the letter to her friend? I

12  have been moved to Jefferson County Jail, in Golden, because

13  Denver County doesn't want to be liable for me anymore.

14         After my story hit the news, the pod I was in went

15  ballistic. Half knew me long before the story came out, so

16  they stood by me and defended me, when the quote, all American,

17  unquote inmates, shook their fists at the sky and screamed to

18  the high heavens that terrorism was against the American way

19  they know and love, dash, roll eyes, dash, the dumbest reason

20  to dislike someone I have heard yet.

21         Now, you and I both know that the codes and morals and

22  all of the rest of it in prisons are a little different, but

23  you're charged with what everybody is calling an act of

24  terrorism and you mock them? How am I supposed to feel that

25  she gets it? You mock them, and call it stupid, to not like me

1   because I might be engaged in terrorism.  How am I supposed to

2   feel that she gets it, when she is saying, frankly, stuff that

3   is so stupid when you know that the FBI and everybody else is

4   watching and recording everything that's being said, she

5   doesn't get it.  She just doesn't get it.  Or I don't get it.

6         MR. PEPIN:  Boy, Your Honor, I have got to say, of all

7   of the things I thought you might latch on to, you are right,

8   never occurred to me that her writing a letter to her friend

9   and talking about the fact that some inmates that she had known

10  support -- didn't let the other ones get to her, which we all

11  know happens in jail all the time, and that they were yelling

12  and screaming and stuff, and that she had a reaction to that,

13  that she wrote about in a personal letter to somebody, I just,

14  I'm sorry, I just don't -- I don't see how that's evidence that

15  she doesn't get it.  I really don't.

16        THE COURT:  What is the evidence that she does?

17        MR. PEPIN:  Well, it is -- it is lengthy.

18        THE COURT:  And --

19        MR. PEPIN:  Well, it's -- depends upon what you mean

20  by get it.  If her talking about another inmate, I mean -- it

21  is not -- it is not evidence that she -- somehow evidence that

22  she doesn't get it.  I mean -- can I back up for just a second?

23  Because somewhere rolling around inside what you are thinking

24  about has to do with this interview, I'm the look-at-me girl,

25  and I have got to tell you there's nothing further from the

1  truth, and here's why.  Okay.  I don't know, did you read the

2  whole story online?

3        *THE COURT:*  No.

4        *MR. PEPIN:*  Let me just suggest to you that if you do,

5  you will see a couple of things.  Number one, we have received,

6  I cannot begin to tell you, the number of requests for

7  interviews, from --

8        *THE COURT:*  I believe you.

9        *MR. PEPIN:*  And from places I would have never

10  thought.  Japanese public television is interested in this.  I

11  guess I'm not really sure.  You make the list though.  They

12  have included requests from a particular reporter who would --

13  and I wouldn't talk to her, and she is the one who generated

14  the thing you saw.  I wouldn't talk to her and Ms. Conley

15  wouldn't talk to her, and her family wouldn't talk to her and

16  that was communicated to her multiple times.

17        A few months ago -- let me just tell you something

18  about the screens at the Denver County Jail and how you go

19  visit if you are doing the Skype thing they have got going on

20  now.  Is you go in and apparently you can sign up and come in

21  and visit someone, and the person inside doesn't know it's you.

22  They don't know who it is.  So if you schedule something with

23  your mom and dad to come and see you, then you know that they

24  are coming.  But otherwise, it's just, you get a visit, and you

25  go and you plop down, and then there it is, a name that pops

1  up, and then boing, a picture.  Guess who popped up?  It's that

2  reporter.  This is several months ago.  It's that reporter.

3  Ms. Conley shut her down immediately.  Didn't hear a word about

4  it.  It just went -- I considered it to be sneaky and trying to

5  take advantage of a 19-year-old girl.  I was furious about it,

6  and frankly, didn't think that someone would do such a snide

7  little thing again.  But, yesterday I go to see Ms. Conley, and

8  she says, Guess who popped in this morning?  Guess who popped

9  in?  And it was that reporter, again.  Bing.  And this time

10 there ends up being a report generated, claiming she granted an

11 interview, which she hadn't.  She had this spring on her this

12 way.  And that she -- the one -- this was a question about the

13 name that she used, and she told the lady her name, and the

14 woman asked her about her hair, which at the moment was

15 plaited, so that it would be curly the next day, and -- and

16 then that was that.  That was that.  That was the interview,

17 that she gave.  And then it's full of a bunch of other stuff,

18 including how one of the things that Ms. Conley said to her

19 yesterday was, I'm not going to talk to you, I'm feeling too

20 vulnerable right now, and didn't you get the message the last

21 time?  They actually reported that, which was honest, little

22 surprising, but honest.  That is not Ms. Conley being the

23 look-at-me girl.  I know she was wearing rows --

24         *THE COURT:*  Fair enough.  Let's not get all incensed

25 about the fact that I say that she is attracted to attention

1    like a moth to flame.  The psychiatrists say that.  The

2    psychologists say that.  This person wants attention, and when

3    you want attention, I don't know where the limits of that

4    attention-seeking desperation go.

5         MR. PEPIN:  I understand.  It was an example, not the

6    fact that you say it generally.

7         THE COURT:  Fair enough.  Fair enough.

8         Why does she think Mouelhi is a good man?

9         MR. PEPIN:  Um --

10        THE COURT:  Because in the presentence interview, I --

11   mean look, I have never met the guy.  He is not a good man.

12   Doesn't take a whole lot of reasoning to come to that

13   conclusion.  But I disavow this, I did avow that, but he is a

14   good man.  No, he is not.

15        MR. PEPIN:  Well, can we go back to -- to what she was

16   headed, what she was going to do.  Okay.  And I know there's

17   all of the rhetoric.  And I know there's all of the Jihadist

18   talk and all of that that occurred during those nine meetings

19   with the FBI.

20        Among the things that she said to the FBI at that last

21   meeting, and I have referred to that in my documents, and it's

22   recorded, it's where I got it, it's recorded, was,

23   specifically, that, you know, I don't know that much about

24   ISIS.  I'm not that interested in the organization.  I'm going

25   for the man.  That's what she said.  She was going to go marry

1   this guy.  I wouldn't consider -- you can think it's flaky,

2   because there's been several times, you can think whatever you

3   want.  But that was what she was off to do.  That was her

4   bottom line, was to do that, and if it meant supporting his

5   cause, fair enough.

6        She had spent time online with this guy.  I have

7   problems with things that he was asked to, like, bring money,

8   and I know that's against the law.  She said no, and he said

9   fine.  You know.  She -- they had talked for hours.  You know,

10  communicated for hours, and this was a person who was coming on

11  to her as -- coming on to her, I suppose, is one way of putting

12  it, but basically was a person who was someone who she believed

13  that she could marry and would have consistent beliefs about

14  Islam with, more than jihad, Islam; being pious, generally.

15  And that was her belief, and she had, in terms of him

16  specifically, and what specifically he was doing, I think he

17  was grooming her, personally.  I don't know exactly what for.

18  I don't know what would have happened to her when she got over

19  there.  It could be that he was the most nefarious human being

20  on the planet.  Could be he is some schmo soldier, in the midst

21  of, you know, you are going to have your really bad guys, and

22  halfway decent guys all fighting on the same damn side.

23       I mean, I hate to bring it up, but look at Germany.

24  There are folks -- it's all bad, but there's your line

25  soldiers.  And so that's her sense, generally, in terms of just

1    as a person, doesn't feel he is a bad person, that's what she

2    thinks.

3         THE COURT:  All right.  But understand that that ship

4    doesn't make it all the way across the lake in my view.  I

5    mean, at the end of the day, she has disavowed jihad, he is an

6    avowed Jihadist.  He is part of ISIS.  Not the ISIS she knew

7    then, but the ISIS she knows now, and she calls him a good man.

8         MR. PEPIN:  Yeah.

9         THE COURT:  And I sit and I say, What is wrong with

10    her?  Does she get this?  And I am not sure that the answer is

11    yes.

12         MR. PEPIN:  Well, and I say, Your Honor, that even

13    those of us with lots of years under our belt, have run into

14    lots of circumstances where there's somebody who we know and

15    who we like who has done really bad things, really bad things,

16    and who the world may feel are horrible, and I just don't know

17    that it's so simple as saying, Well, she should realize that

18    he -- that he is a horrible human being, just because he is

19    necessarily a member -- for all I know the guy is a -- you know

20    a courier.

21         THE COURT:  She disavows jihad but doesn't disavow

22    Jihadists?

23         MR. PEPIN:  You mean a Jihadist, which is I think --

24         THE COURT:  That she knew for maybe a month or two on

25    Skype.

1        *MR. PEPIN:*  You -- Your Honor.

2        *THE COURT:*  Come on.

3        *MR. PEPIN:*  I still haven't bought into the notion of

4    Internet dating.  I mean, come on, I understand, but let's --

5    there is a -- there's two things going on --

6        *THE COURT:*  You are married.  You don't need to

7    understand Internet dating.  Go ahead.

8        *MR. PEPIN:*  I don't need to.

9        *THE COURT:*  You are married.

10        *MR. PEPIN:*  I'm certainly married.

11        *THE COURT:*  Char would have some objection.

12        *MR. PEPIN:*  She would have some objections, but the

13    concept I'm not sure I understand all that well.  But, I think

14    that what we have is a couple of different aspects here; one,

15    you and I did not grow up in a system where there was a -- some

16    sort of arranged marriage, or any sort of marriage or

17    relationships that really developed outside of knowing someone

18    personally, and that's different, I'm not going to say for

19    every Muslim, but it's certainly different in the culture,

20    generally, that's the first thing.

21        Second thing is, you know, you have these Skype

22    relationships, Internet relationships, in-depth ones, people

23    believe cheating by Tweet, all of these things are concepts

24    that are out there, and I -- I believe it's too simple to say,

25    Boy, this sure sounds ridiculous.  Is it indicative of a number

1  of things that we hope will be addressed, and that hopefully

2  this whole experience has helped her to address?  But her,

3  honestly, turning to that psychiatrist and saying, you know,

4  that man has put me in all of this --

5  THE COURT:  She said it to the probation --

6  MR. PEPIN:  I'm sorry.  You know, I was there.  I --

7  that's right.  She did say that.  But, you know, I -- it's -- I

8  don't see that as a horrible thing.  I think it's

9  understandable.

10  THE COURT:  I didn't say it's a horrible thing.  I

11  just said it makes me doubt that she gets it.

12  MR. PEPIN:  I just don't ... I understand you are

13  saying that.  I know it's coming from --

14  THE COURT:  Look, I want to marry Charlie Manson,

15  okay.  There's someone that actually wants to do that.

16  MR. PEPIN:  Yes.

17  THE COURT:  Do I think that person gets his crime?

18  No.  Do I think she gets it?  No.

19  MR. PEPIN:  Your Honor --

20  THE COURT:  You can't be on both sides of some issues.

21  There are many issues you can be, as I said, you can have a

22  picket going where pickets don't normally go, by having one

23  foot on one side of fence, another foot on the other side of

24  the fence.  But this -- this is a tough one to be on both sides

25  of.

1      MR. PEPIN:  And I do not think -- I just cannot agree

2  that that is what this says.  What this --

3      THE COURT:  Alone, perhaps not, but you combine it

4  with mocking people, who profess, whether it's overdone or not,

5  to be -- that terrorism is against the American way, and you

6  go, roll my eyes.  And you know that the FBI is looking at

7  this.  How can you tell me she gets it?  You say that the

8  notion -- the evidence that she gets it is long, show it to me.

9      MR. PEPIN:  Well here -- here is what I --

10      THE COURT:  But.

11      MR. PEPIN:  Okay.

12      THE COURT:  But this woman here is going to assault me

13  if I don't give her a break.  So let's take 15 minutes, come

14  back, and you can pick it up there.

15      MR. PEPIN:  Thank you, Your Honor.

16      THE COURTROOM DEPUTY:  All rise.

17    (Recess at 3:34 p.m.)

18    (In open court at 3:46 p.m.)

19      THE COURT:  Please be seated.

20      MR. PEPIN:  Your Honor.

21      THE COURT:  Floor is yours, and I promise.

22      MR. PEPIN:  The floor is mine.  I don't know what to

23  do with it by myself.

24      THE COURT:  Well, I was going to say, I promise not to

25  interrupt, but I'm not sure I can keep that approach, but we

1  will try.  Go ahead.

2          *MR. PEPIN:*  I'm sorry.  I was just looking for

3  something in the letter you referred to earlier where there's

4  the reference to the -- half the inmates being --

5          *THE COURT:*  Take a minute.  It's fine.

6          *MR. PEPIN:*  Thank you.  I have found that, and I

7  wanted to make sure that what Ms. Conley told me was -- it was

8  accurate.  I know she believed it to be, but I wanted to make

9  sure.  You used air brackets -- or air quotes, when you

10  referred to, and I wasn't sure it was actually written down in

11  that way.

12          *THE COURT:*  It was.

13          *MR. PEPIN:*  Well, it was, and that's -- so here is the

14  dynamic, and it's all part of this entire thing about her being

15  in jail with people who are charged with offenses and the like.

16  So she was -- they had her in a fairly high-security section in

17  the jail, half of the people she got along with, and a bunch of

18  them were as mean as they could be to her, and all of them had

19  bad records.  So basically they had been going out, causing all

20  kind of offenses.  I'm not going to argue about the

21  seriousness, but talking about drug offenders, sex, drugs and

22  rock and roll, whatever, and the irony that they would be there

23  screaming at her about how she was a terrorist, as if they were

24  some sort of all American group, in quotes, which is how she

25  wrote it, is what she was referring to, which makes some sense

1    and what you have here is it's this whole dynamic that goes on

2    in a circumstance like this.  I mean, we're talking about

3    someone whose -- plays in a variety of ways, with regard to

4    jail, when you have the someone who really doesn't have that as

5    part of their world.  They are cast in a world where that's all

6    around them.  Do you make friends?  Do you not make friends?

7    Do you relate to people?  Do you not?  I'm not going back into

8    that whole thing that I got so upset about in my pleadings, but

9    I -- it is all part of that dynamic.  We have people who are

10   preaching to you, who are out selling drugs and committing

11   robberies and all of that.  And so I think if we're talking

12   about the question of does she get it and that being

13   representative of the fact that she didn't, I don't think it

14   does.  I mean, what it does is it's a reflection of the life

15   she is living in jail, and frankly was learning during that

16   time.

17        THE COURT:  "Dumbest reason not to like somebody."

18   Because they think you are a terrorist.  Really?

19        MR. PEPIN:  And I don't know, Your Honor, we're

20   talking about -- had she turned 19 yet.  She was 18 when she

21   was arrested, 19 years old, writing to a friend of hers.  I

22   mean I -- I'm sorry, I just -- I'm having the most difficult

23   time believing that somehow or another that is dispositive or

24   even --

25        THE COURT:  I didn't say one thing was dispositive.

1  But what you are saying here is, I feel like I'm watching an

2  Arthur Murray commercial, and I am dating the hell out of the

3  myself.

4          *MR. PEPIN:*  Holy moly, Your Honor.

5          *THE COURT:*  Because the feet, they are a moving

6  awfully fast.  But on the one hand, you know, all the things

7  that are -- that are problematic, are the problem -- are the

8  product of something else.  It's the Internet, as if you -- as

9  if I were to Google the word Muslim and the only thing that

10  pops up is the word jihad.

11          *MR. PEPIN:*  I'm not doing that.

12          *THE COURT:*  It's, Well, she got tricked by this guy.

13  Well, she just didn't understand prison.  Well, she just didn't

14  understand the FBI, and then it gets compounded with,

15  Mr. Elibiary saying, They didn't know what they were doing.

16  What is it where she gets it, where she says, I screwed up, and

17  I was wrong; not that I was confused, I was wrong, and it

18  doesn't matter whether her religion or her religious beliefs

19  led her to believe that you could support terrorism.  You

20  can't.  No reason --

21          *MR. PEPIN:*  You mean, other than coming in here and

22  doing it, because that's what she is here to do.  She has pled

23  guilty.

24          *THE COURT:*  We will see.

25          *MR. PEPIN:*  And I am telling you, and I will prove it.

1    When the time comes.  The proof of the matter is, Your Honor,

2    you know what we have, I understand she wrote letters, upon

3    letters, upon letters, upon letters.  The FBI read them, read

4    them, read them.  Wrote letters to friends, read them, read

5    them, read them.  She communicated with people that she had

6    been in jail, read them, read them, read them.  There were a

7    couple of fan mails, she responded to those before she shut

8    those down, because she didn't think it was appropriate.  She

9    worked through workbooks.  Everything that everybody has read,

10   everything, everything, except, and I just was not anticipating

11   that her being upset that people were calling her a bunch of

12   bad names was going to be pivotal.

13           THE COURT:  You are -- you are twisting the way I view

14   it.

15           MR. PEPIN:  I'm not meaning to twist it.

16           THE COURT:  It's okay.  I understand.  It's not that

17   people were calling her bad names, it's that she is mocking the

18   concept.  Quote, All Americans.  That's a stupid reason to

19   dislike me.  I mean, you and I may just see this very

20   differently.

21           MR. PEPIN:  Well I think so, because people -- like to

22   think that people might like them, not because they are charged

23   with terrorism, but because they are a person.

24           THE COURT:  Show me the thing in all of these hundreds

25   or whatever letters or comments or tapes that says she gets it.

1          MR. PEPIN:  Okay.  I just ran through a list of all of
2     the things that everyone has looked at.

3          THE COURT:  Hm-hm.

4          MR. PEPIN:  Okay.  They reflect a girl who is -- has
5     absorbed the fact that she has lost her ability to work as a
6     CNA, and is working hard to figure out what she might do next;
7     including, outlining her goals, her dreams, the kind of person
8     that she is, the kinds of things that she wants to pursue and
9     how she might go about getting there, which frankly, I wish my
10    19-year-old daughter would sit down and do.  She is sitting,
11    working through macroeconomic books, because she wants to try
12    and better herself.  She is studying Spanish, which
13    unfortunately is -- some of the people in there happen to speak
14    Spanish committing crimes, so now she's friends with them and
15    that's a bad thing.

16         THE COURT:  I didn't say that.

17         MR. PEPIN:  I know you didn't say that, somebody else
18    did.

19         So she is writing these beautiful lengthy discourses
20    between herself and her mother and her sisters about their
21    religion, about Christianity and the tenets of their belief,
22    working through daily lesson plans with them, talking about how
23    it compares with Islam, and showing, in a respectful and
24    communicative way, how much she basically cares about what they
25    think about and here is what my world is.

1        She is -- she writes this -- these letters to Allah,

2   that are heartbreaking.  I just thought they were -- I just

3   didn't include one to you.  They were very -- I gave you

4   several things.  There's only so much you want to have to read.

5   But this plea for, Please help me understand.  I mean, I know I

6   have done wrong, but please help me understand.  She talks

7   about how she doesn't believe the same way she did in terms of

8   a violent jihad to the psychologist.

9        THE COURT:  Yeah.  And we have discussed, I don't know

10  what the heck that means.

11       MR. PEPIN:  Okay.  Well, I will be happy to talk -- in

12  fact, I want to talk about that a little bit.  When I get done

13  with this little list of mine.

14       THE COURT:  All right.  Fair enough.

15       MR. PEPIN:  So every -- everyone of these

16  communications, except for occasionally calling a jailer a bad

17  name or something, everyone of them is -- is a person who is

18  completely different totally in the moment, studying trying to

19  learn, believing things.  She changed her name, it was Halima,

20  this may fit into the pattern --

21       THE COURT:  Twice.

22       MR. PEPIN:  To Amatullah, and the reason she did that,

23  what she told me, it's what she said all along, the Halima who

24  came in here is not the Amatullah that is here today, because

25  she went through this -- I described it as violent -- earlier,

1    as her skin being ripped off, turned inside out, that's

2    exactly --

3         *THE COURT:*  She had another name before Halima.

4         *MR. PEPIN:*  Shannon.

5         *THE COURT:*  There was another one.  I think it began

6    with an F.

7         *MR. HOLLOWAY:*  Fatima.

8         *THE COURT:*  I think that's it.  One second.  It's a

9    minor point.

10        *MR. PEPIN:*  And so what?  I mean, except for the fact

11   --

12        *THE COURT:*  The reason I bring it up is, don't tell me

13   changing your name means you get it.  She changes her name like

14   I change my socks.

15        *MR. PEPIN:*  I'm not doing that.  What I'm saying is

16   that if you -- we can plow through the correspondence, we can

17   see the change -- the exchanges.  We can understand -- we can

18   see her lecture other people whom she has been in jail with

19   about how their lives -- the drinking and stuff they are doing

20   is not a good way to approach things, and her children should

21   not be around them.  We can see them mention, when they write

22   something to her, that she wouldn't drink with them.

23        *THE COURT:*  I saw those letters.

24        *MR. PEPIN:*  So, you know, basically what we're talking

25   about, is every -- except for the fact that she didn't, for the

1    FBI or whoever edification, when they are looking at stuff, she

2    did not write in there, Boy I get it.  What's happened instead,

3    is that there an entire package of material of all of this

4    communication, extraordinary, all of these communications with

5    her parents, that don't suggest, in any way, violent jihad, and

6    don't suggest, in any way, anything but a total, and I am going

7    to use the word, submission, probably get Mr. Holloway's hair

8    on the back of his neck up but, total submission to this

9    situation.  I don't care if she does get mad at a guard and

10   call him a name every now and then.

11            THE COURT:  I don't either.

12            MR. PEPIN:  So, that's what she has done; she has

13   totally submitted, and that submission is the getting it.  It's

14   getting it in aces.  And the name is simply representative.

15   But it's an important representation, I think, of an important

16   situation, concept, and where she is --

17            THE COURT:  Go ahead.

18            MR. PEPIN:  -- to the jihad aspect.

19            I do not pretend to understand this in any real

20   significant way, except as it applies to this particular

21   discussion, I hope.  I don't know if it's really looked at this

22   way by Muslims, but there are basically two kinds of jihad.

23   They are discussed in some of these materials, although I don't

24   think they are really outlined this way.

25            There is the jihad, which is considered the major

1    jihad, and that's the jihad of looking inside, of coming to

2    terms with things in your relationship with Allah and yourself,

3    and that is the major jihad.  Minor --

4         *THE COURT:*  That is my understanding as well.

5         *MR. PEPIN:*  Okay.  Minor jihad is this -- this -- and

6    you can characterize it as violent jihad, or sometimes there's

7    references to defensive jihad, sometimes to offensive jihad,

8    and radical jihad, and all of that.  This other thing that

9    basically, apparently, has to do with the concept of defending

10   Muslims against people hurting Muslims.  The basic idea being

11   that.  And sometimes it can be other Muslims.  I don't know.

12        So the general notion, as I understand, sort of, the

13   junk that's been put out there, and stuff that was filling

14   Ms. Conley, was this idea that -- that it's defensive jihad but

15   you are having to act in an offensive way, and, you know, kind

16   of this global sort of attack, generally, one way or another,

17   to be devout; to be a good Muslim.  And there are a handful of

18   ways in which this can happen.  It can be that you go to

19   someplace where Muslims are attacked.  There are some angles

20   that would have to do with you actually attacking anyone who

21   has ever attacked a Muslim, more radical perspectives.  There's

22   a whole range of things.  As Ms. Conley told the FBI, and as

23   she has told -- well, I think the FBI is what I'm remembering

24   at the moment.

25        She wasn't looking to really go and hurt anyone.  She

1　wanted to act in defensive jihad, because she felt it was

2　necessary; meaning, to her, that she was -- that she believed

3　that what she was being told was defensive jihad, was the thing

4　that she needed to do; meaning, go, be with these people,

5　support her man, be involved in all of that.

6　　　　Her view now about what defensive jihad is, has

7　narrowed considerably.  It is no longer -- because there are

8　folks out there that say you need to attack the United States,

9　because the United States was involved in Iraq or Afghanistan

10　or the like.  She was never that far, and --

11　　　　*THE COURT:*  Why are you telling me that?  She was

12　saying you can attack Westerners.  It's okay.  Frankly, she was

13　saying things that are disturbing and not related to jihad,

14　like, Well, I may be able to justify the World Trade Center

15　because there were houses of usury therein.  I'm sorry, it's

16　not even that her bizarre, violent or defiant comments were all

17　based in jihad.  They weren't.

18　　　　She said with respect to killing -- now, I will give

19　you this before you even say it, because I know it's going to

20　cross your mind, with respect to things that some right-wing

21　Christians believe, which is, that it's okay to attack abortion

22　doctors.  Her view on that was, That's fine.  Not because of

23　jihad.  I mean,  there are these things, and that's why I said

24　at the beginning, this isn't really about whether she is a

25　Jihadist.  It's relevant.  But the disturbing notions that kind

1  of drip off of her, extend beyond that concept.  She seems

2  drawn to things that are extreme.  She likes to shock people.

3         Now, I'm not going to pick on a middle-school kid, but

4  to some extent, when you are goth, you are looking for a

5  reaction.  Your mother is an educator.  You quit high school.

6  Your father is an atheist, you become as fundamentalist a

7  religious person as possible.  The Faith Bible people are

8  concerned about you, so I'm going to make them think I'm a

9  terrorist.  The FBI asks you about, Would you do a suicide

10  bomb?  And you go, Very unlikely.  I mean, these are things

11  that are troubling and they are not all tied to jihad.  They

12  are all part of her.

13         MR. PEPIN:  So I think that takes us right back to

14  where you were discussing things with Mr. Holloway, and that

15  is, So really is the solution to send her to prison?  And this

16  is just in terms of that particular perspective.

17         THE COURT:  Right.

18         MR. PEPIN:  My response, and I'm sure it doesn't

19  surprise anybody, is Absolutely not.  I mean, you have got a

20  concern about her being vulnerable.  About her being someone

21  who is susceptible to influences of whatever flavor, and we

22  keep her in prison.  Doesn't make the slightest bit of sense to

23  me.  There is -- you are absolutely right, I don't have to say

24  it, but I'm going to, the idea of sending someone to B.O.P. to

25  get mental-health treatment is laughable, and so if the concern

1    is, and you make valid points about the various things that

2    say -- that say opposition or the like.  But do those translate

3    into her needing, her now, without getting to deterrence or

4    protection, but her needing to be put into prison?  I think the

5    answer is, No.  If you think -- if we think those things are

6    troubling enough to bear mention, to say that they play a part

7    in this, then mental health is where it should be, and the fact

8    is, had she decided -- I mean, if -- if she hadn't latched on

9    to this, and walked around being goth, or saying, Hey, look at

10   me, or being whatever religion, opposed to her dad, or all of

11   that, if she hadn't agreed to meet with the FBI, which she did

12   openly, maybe that's part of this demonstrative stuff we are

13   talk about, we wouldn't be here, because no one would know.

14   She wouldn't have committed this thing, or we wouldn't know

15   about it.

16          And so I, in terms of addressing her needs and what

17   needs to happen, undeniably she has been punished.  She has

18   been punished in aces for her, in this set of circumstances.

19   It has ripped her inside and out, and I -- this -- I don't get

20   that she-doesn't-get-it thing.  I mean, oppositional?  Perhaps.

21   Demonstrative?  Perhaps.

22          THE COURT:  Oddly, I don't get that you don't get it.

23          MR. PEPIN:  Well, I'm not terribly surprised, but how

24   someone can -- can -- most of us don't bear record, unless we

25   are writing a diary of the person who they are.  The person

1   they are trying to be. And the kinds of things that they are

2   going through. And she has and mailed them to the FBI for all

3   practical purposes, at least knowing they were there. Sending

4   them off to her parents. We are not talking about a couple of

5   notes that say a couple of things. We are talking about a

6   dialectic with her family about religion in a respectful way.

7   We're talking about her really trying to move forward in a way

8   that improves her, and those kinds of things, I think, scream

9   that she gets it, and that's how I see it, and if you don't I

10  appreciate that.

11          *THE COURT:* Deterrence.

12          *MR. PEPIN:* I'm sorry.

13          *THE COURT:* What I call the public-interest factors.

14  Deterrence, that whole other side of the equation.

15          *MR. PEPIN:* Yes. Well, so with regard to the

16  questions of the deterrence, I mean, obviously there's two, get

17  your minor deterrence, major.

18          *THE COURT:* Yeah. Okay. I'm getting tired too. Go

19  ahead.

20          *MR. PEPIN:* There is, of course, whether or not she

21  has been deterred. I think she has been punished. I think she

22  has been deterred. She isn't going to make the stupid mistake,

23  again, and she will comply with whatever the Court wants to,

24  when she is in the community.

25          *THE COURT:* Despite the fact that she is defiant as

1  hell?

2       MR. PEPIN:  Despite the fact she is defiant.  Yes.  I

3  mean, really, she has never had this kind of clamp on her.

4       THE COURT:  I agree with that.

5       MR. PEPIN:  And there's --

6       THE COURT:  But frankly, most people would wet

7  themselves if the FBI knocks on your door.  Not go up to them

8  with a T-shirt.

9       MR. PEPIN:  Okay.  That may very well be.

10       THE COURT:  But the big issue is -- is the deterrence,

11  as to others.

12       MR. PEPIN:  As to others.

13       MR. PEPIN:  So let's -- let's, if we can, I will try

14  and frame it to some degree in the way I would like to, and you

15  may have your way with it.  You will have your way with it, if

16  you want.  Of course I'm not just giving you permission to.

17       THE COURT:  You are a little defiant too, huh?  It's

18  okay.

19       MR. PEPIN:  I have worked with a few defiant people

20  over the years.

21       THE COURT:  Okay.  I understand.  Go ahead.

22       MR. PEPIN:  The people who are going to be deterred by

23  whatever happens in this courtroom and whatever is said about

24  Shannon Conley are not going to be ISIS fighters who are

25  already over there doing whatever, or the big bad terrorists.

1  The ones who, instead of really were thinking more along the

2  line of humanitarian situations, and thinking about trying to

3  help people and believing in just generally that sort of world,

4  the ones who have been taking care of old people's bedpans and

5  bedsheets, those people are not going to be deterred by what we

6  do here.

7          The people who are deterred, who have the potential to

8  be deterred are the ones like Shannon Conley.  Are the ones who

9  will look up and they will see what this has done to her.  They

10 will know that she spent time in jail; that a Court has clamped

11 down on her and controlled her; that it -- that it changed her

12 entire life; that she ended up with -- when I say that I know

13 she was about ready to go overseas.

14         THE COURT:  My only comment is, in this respect, look,

15 if we were looking at 15 years, I don't know that there's a

16 scenario where I will say, with the strange things that are

17 going on in her background, that 15 years make as lot of sense.

18 But one of the things that would have been a whole lot better,

19 was the -- potential for lifetime supervised release.  I'm not

20 saying I wanted her on lifetime, but I'm pretty much boxed in

21 now to three years.  So yeah, okay.  I can control her for

22 three years, and I wish I had more options.

23         MR. PEPIN:  If -- I guess what concerns me about this

24 is I understand control over her for three years out of jail.

25 But if the concept we are wrestling here is, Do I need to keep

1  her in jail for a total of four years, then give her another

2  three years, because the public needs to be protected from her,

3  I hope that is not where you are headed.

4  　　　　*THE COURT:*  No, that's not where I'm headed.  Where

5  I'm headed if you are going to say the fact that I have got my

6  control on her is going to deter other people from doing

7  things, it would be a lot more deterrence if that control

8  extended further in time than simply three years.  It doesn't.

9  　　　　*MR. PEPIN:*  I see.  I see.  Although, you know, we --

10  as I say, it's going to be people like Shannon Conley, who this

11  deters, if anyone, and it is -- it speaks to what -- the

12  sentence that we ask for speaks to one punishment, because she

13  has been punished.  We have dealt with sentences that have gone

14  lifetime and wrestled even with death along the way.  To her,

15  this nine and a half months has been hell, and it has -- and

16  every day beyond is going to be that way.  And it is difficult

17  for her, and she struggles with it, and it is -- anyone sitting

18  in her position, looking over and saying, Should I make this

19  choice?  Should I go and try and marry this guy, with all of

20  her kind of, again, similarly situated person, they are going

21  to be deterred.  They see what has happened her.  She has been

22  the object of derision.  She has... you know, what she also has

23  been, and what I ask this Court to continue, is that she has

24  been the object of some mercy.  That, you know, we appreciate

25  what the Government has done.  We know it, we appreciate it.  I

1  have told Mr. Holloway numerous times, and Mr. Byrne, I feel

2  exactly the same way.  I know they were trying to help her, and

3  we appreciate the fact that they have given her a sentence that

4  is -- the range that is lower.

5       People looking out over, you know, seeing someone in

6  her situation is going to look close.  They are going to see

7  the five years as a potential range.  They are going to see the

8  fact that she was put into custody and away from anything that

9  was familiar, and that she has got a felony that's going to

10 whack her for the rest of her life, and follow her in one way

11 or another.  She lost her CNA license.  And that people talk

12 about her in the media, and that, you know, punch her up on the

13 blog, and see what kind of stuff you get, because it's pretty

14 nasty, and -- and -- the Blogosphere, I should say.

15      So what I'm asking you to do, Your Honor, I would like

16 to see us put her in a situation where what we're saying to

17 everyone is that we're walking her back off the edge, and it's

18 a nasty edge, and she is saved, frankly, from that, and thank

19 God she is, but us bringing her back and us doing everything to

20 move her into a situation where she can now move forward,

21 that -- that's a beacon.

22      *THE COURT:*  That's a hell of a pivot, but it doesn't

23 have much to do with deterring others.

24      *MR. PEPIN:*  Oh, Your Honor, I think it does.

25      *THE COURT:*  Pivoting from, Let's put our arms

1    around -- from my question, which is, What is it that others

2    will think that will cause them to stop their commission of

3    felonies?  And the answer is, They will do it because we

4    embraced Shannon?

5          MR. PEPIN:  No.  As a matter of fact, there are two

6    elements here, and the first what I said -- the first part that

7    I said was that she has received a sentence; that she has been

8    held in jail; that for someone who is 19 with no kind of record

9    like that, it changed everything about her world.  You know,

10   she has, may not seem like much to us, she is wearing a hijab

11   in here now.  She doesn't to get wear one in jail.  It's

12   embarrassing to her.  It's frustrating.  It's not something she

13   is comfortable with.

14         THE COURT:  You are asking me to give her a

15   misdemeanor sentence.

16         MR. PEPIN:  I'm not asking -- if I was asking you to

17   give her a misdemeanor sentence, and only that, there wouldn't

18   be one available for this felony of a year and a month.  There

19   is.

20         THE COURT:  We are quibbling.  You are asking me for a

21   year and a day, which amounts to ten months, which amounts to

22   her getting out, right away.

23         MR. PEPIN:  Well, it does.  That's exactly right.

24         THE COURT:  That's basically what I mean when I say

25   you are asking me for a misdemeanor sentence.

1     MR. PEPIN:  You know, misdemeanor sentences are

2   misdemeanor sentences, but sometimes they are felony

3   sentences -- people get probation for felonies.

4     THE COURT:  I understand that.  I'm looking at this

5   from the concept of other people looking at this.  The concept

6   of deterrence.  Go ahead --

7     MR. PEPIN:  Does it have to be the amount of time that

8   necessarily says that?  The fact that she has -- the fact that

9   she has been placed in jail, which she has been, has been in

10  jail, which she has been, has -- has her life impacted forever,

11  which it will be, has lost her specific livelihood, which she

12  has, been the subject of intense media scrutiny, which will not

13  help her walking down the street or trying to get a job or

14  whatever, which it has.  I know that's not -- we are talking

15  about basic impacts of this kind of conviction, and what the

16  world will see, and that's what the world will see.  And if you

17  give her another, I mean, I don't know, give her 48 months,

18  that plops her into a prison for 48 months, with no

19  mental-health treatment, and I guess a sign to someone that

20  maybe it would be a bit worse if you go.  I mean if you decide

21  you are going to go with this.  But a year and a day does the

22  trick.

23     And I think there's a second part of it too,

24  Your Honor, and I absolutely do believe that the fact that we

25  embrace Shannon Conley is a deterrent, and here is why I say

1  so.  I think what it says to the world and to these people who

2  are out there maybe thinking along those lines, is that we

3  really, really want them to be part of us again.  To come back

4  into us again.  That we embrace them.  That we are a beacon,

5  and not a sword.  We have had enough swords.  I mean you hear

6  about it all the time.  I think that I ask you to recognize

7  that what has happened to her has been punishment, significant

8  punishment, and I believe the world will see.

9       *THE COURT:*  Let me hear from her.  Yes.  Ms. Conley,

10  would you go to the podium, please.  I know it is difficult to

11  sit and listen to yourself be talked about, and I do not take

12  lightly the stress that that causes, and the pain.

13       This is your opportunity to tell me anything you want.

14  I will consider it, whether it be in connection with the crime,

15  the sentence, your life, or anything else.  I welcome your

16  comments.

17       *THE DEFENDANT:*  Okay.  Your Honor, nine and a half

18  months ago I attempted travel to Syria in order to marry a man

19  I knew was a member of ISIS.  Though far from my priority, ISIS

20  was described to me as a jihad group comprised of Muslims who

21  were fighting to protect Muslims in Syria, who were being

22  murdered by the thousands.  I was content with this

23  description, didn't research further.

24       I agreed to continue with the plans in marriage and

25  pledged my support to his cause.  When I first desired to study

jihad, I journeyed to find the viewpoints of a wide variety of of participants; Westerners, Modern Muslims and Mujahideen Muslims; those Muslims involved in jihad?  Looking back I think I should have included those of the victims, as well.

Literature on Western views and Mujahideen was abundant, but I found the responses of the Modern Muslim community sparse and frequently tainted by a tone of fear. Fear of being persecuted for their views.  I mistook careful stepping for cowardice, and quickly closed my ears to the modern argument and therefore the arguments later made by Agents Khomssi and Hafiz, both Modern Muslims.  Had I given heed to their words, I would have had to face renewed inner struggle between what I believed and what I have been taught, and risk breaking commitments I had already made with the man from ISIS.  I did not want to face this difficult decision, so I chose to ignore it and continue on my way.  This was unwise, and I have since changed my position.

Now I strive to know all of the viewpoints on jihad, power to ability no longer a factor in my search.  It was after my arrest that I learned the truth about the ISIS I had been taught to respect.  I was horrified as I watched on the news my fellow Muslims murdering people irrespective of their faith, kidnapping journalists with no intent of seeking a peaceful resolution, and marking homes of Christians with the arabic letter known, threatening them to convert or risk death.

1     Though my views on jihad have never been popular, I

2   hadn't thought Mujahideen would ever commit these acts while

3   still believing they were acting in the name of Islam.  It is

4   my view that they are doing exactly the opposite, and are

5   shedding the innocent blood of thousands.  I'm glad I have

6   learned of the true identity here instead of on the front

7   lines.  I'm sincerely grateful to the FBI for keeping me from

8   traveling to Syria and for potentially saving my life.  But

9   that is not the only thing I learned while incarcerated.  I

10  have learned much more.

11     There are two general areas I can tell you about.

12  First, and most important, is that of my journey in Islam.  In

13  the Muslim community when a religious claim is made, it is

14  usually backed up by a hierarchy of four sources.  First -- the

15  first is the Quran; second, the life and sayings of the profit

16  peace be upon him; the third is the lives and sayings of the

17  companions of the profit, peace be upon him; and lastly are the

18  opinions of the scholars.

19     Before my incarceration, I would research only the

20  opinions of the scholars, and assumed that their evidence was

21  sound.  But since my incarceration, I have had the chance to

22  read the entire Quran, from cover to cover, which I hadn't done

23  before, and come to the conclusion that the scholars I was

24  listening to distorted parts of the Quran to their favor, and

25  it was idiotic to think that was an impossible situation to

1   come by.

2          I'm truly embarrassed that I had not researched Islam

3   and jihad using this hierarchy of authority.  I think had I

4   done so, my response when confronted with radical jihad would

5   have been different, and I wouldn't be here before you today.

6          I disavow these radical views I have come to know, and

7   I now believe in the true Islam where peace is encouraged

8   instead of violence.

9          The second general area I have learned about is that

10  of humanity and existence in a community that is contrary to my

11  lifestyle.  For the last nine and a half months I have been

12  forced to live with people of every religion and every walk of

13  life.  I have learned that these folks do not aspire to

14  mediocrity, and are not inherently evil because of their denial

15  of Islam.  In fact, I have learned the opposite.  Most women I

16  have met in jail ardently plan to live life better, just as I

17  do.  I have learned mercy from these people who have known

18  cruelty, and I have learned patience and love from --

19          *THE COURT:*  Take your time.

20          *MR. PEPIN:*  Want to sit down for a second?

21          She needs to sit down.

22          *THE COURT:*  I was going to say, let her sit if she

23  wishes to.

24          *THE DEFENDANT:*  I have learned mercy from these people

25  who have known cruelty, and I have learned patience and love

1 from those who have persevered through decades of hard life.

2 The folks I have been taught to hate are now humanized. I do

3 not now nor have I ever had any desire to hurt them, even

4 though I was committed to the idea of jihad, I never wanted to

5 hurt anyone. It was all about defending Muslims.

6        I would like to use the lessons I have learned while

7 incarcerated to better the lives of the folks like the inmates

8 I have described. But the point is that I will move on from

9 this experience and will use it to the advantage of those I'm

10 around.

11        This life-altering experience has also forced me to

12 reflect on my character defects, including ignorance and

13 personal arrogance in my belief system. I realize I have

14 merely just begun a lifelong process of expanding my

15 perspective. I'm deeply humbled by this opportunity to grow,

16 and would like to include the lessons of respect, tolerance and

17 coexistence I have learned in my future efforts of being a

18 catalyst for positive change in my community.

19        Your Honor, though I have start -- though I started my

20 incarceration hateful, naive and inexperienced, I have learned

21 from this time in jail and have since grown in my faith and

22 perspective, and I intend to grow further still. I do not

23 believe I'm a threat to society, and would appreciate the

24 opportunity to prove it.

25        I intend to move forward in a positive way. I intend

1    to do good.  I ask that you allow me to begin to move forward,

2    and to begin to close this chapter of my life.  Thank you for

3    your time.

4         THE COURT:  All right.  You want a chair?  Let's do

5    this from the table.  You don't want anything, do you?

6         MR. HOLLOWAY:  No, Your Honor.

7         THE COURT:  In fashioning a sentence here today, I

8    have considered the wealth of materials before me.  Some of

9    which I have touched upon.  Regardless of whether touched upon

10   it or not, they have been considered, and considered fully,

11   including the presentence report, all matters related to that

12   report filed by the Defendant and the Government, the

13   statements and arguments of counsel for the parties here today,

14   and the statement of the defendant.

15        I'm mindful of the fact that I am required by law to

16   impose a sentence sufficient but not greater than necessary to

17   achieve all of the purposes of sentencing as described in 18

18   U.S.C. Section 3553(a)(2).

19        In fashioning such a sentence, I have considered both

20   individually and as a whole all of the 3553(a) factors which

21   must be considered in determining a sentence.  Specifically

22   including those that have been addressed with counsel, those

23   that have been addressed in the writings of counsel and those

24   that have been addressed by me in discussion or argument with

25   counsel here today.

1      Ms. Conley, what I do is I tell you what I'm going to

2  do and why, and then I get into the more technical language in

3  imposing a sentence.

4      This is anything but an easy case. There are, and

5  we've just kind of touched on them and moved along. Things in

6  your background that are -- that are clear to me that show that

7  there are mental-health issues that need to be addressed. I

8  find it unfortunate and sad that, as far as I can tell, I can't

9  find a friend that you have had or a relationship with people

10  that seems age appropriate to me.

11      Going back, whether we're talking about the October

12  events of 2012, the December events of 2012, the Egyptian

13  tutor, even the congrate friend is significantly older than

14  you, and I grant you that that is isolating. I know that you

15  are young. I know that you are naive. I know that you are

16  uncomfortable with yourself. I recognize this is a first

17  offense and, that you do have family that even now supports you

18  greatly. And I recognize that this conduct occurred in the

19  turmoil of that timeframe, and all of that cuts in your favor.

20      What cuts against you is that I heard what you have

21  said, I have heard what Mr. Pepin has said. I don't know

22  what's been crystallized in your mind with regard to broader

23  issues than jihad, because as I said, not all of the offensive

24  positions that you have taken were grounded in jihad. It was

25  grounded in insult to religion, and I have no idea where you

1    stand on that topic, and I don't mean to minimize it, but the

2    events in France indicate that it doesn't necessarily have to

3    grow from a Jihadist fountain, that insult also leads to

4    violence in certain people, and I have less than a clear

5    conviction in my mind that you know where you stand on things

6    today.

7              I have talked about other aspects, and what I have

8    tried to do is not look at you at a single moment in time.  I

9    have tried to look at you across a spectrum of time, and see

10   whether or not the things that I think contributed to your

11   conduct continue to and exist or are recognized or are still

12   there.

13             We -- I hate the term Get It, and Mr. Pepin and I have

14   gone around and around and around with regard to that.  I'm

15   still not sure you get it.  It gets put too simply into the box

16   of jihad.  It is a much bigger issue than that.  It gets

17   explained away as it's just romance.  As if that were an

18   explanation.  And it diminishes the role of women, and it also

19   diminishes the seriousness of simple support.

20             It's as if loving a dangerous person and saying, I

21   support you, it's okay, is somehow not or in some way less

22   serious than being the actor.  It's as if, I didn't do it.  I

23   simply support the person who did it.  That there's some major

24   distinction between those, and there is not.

25             You can say that you were attracted to this man for

1    love, and I don't understand, anymore than Mr. Pepin, love

2    coming through the Internet, but the point is, it doesn't

3    matter whether you loved him.  It doesn't matter whether you

4    wanted to marry him.  It doesn't matter whether you were

5    attracted to him because of his Jihadist views, and I believe

6    that you were, and it doesn't matter whether you believe that

7    your religion required you to do this.

8         The point, the It, in this discussion is, you can't do

9    it, and your rationalizations don't take issue with the fact

10   that you can't do it.  If your religion, as you fervently

11   requires you to do it, you still can't do it.  And when you are

12   told not once, but twice, it's tricky, it's a very difficult.

13        The other issue is, as I said, I look at the crime,

14   and I am not going to let people moonwalk backwards away from

15   their admissions.  You also said you would fight, if necessary.

16   And that raises the seriousness of this to an enormous degree.

17   But the thing that really cuts against you is the

18   public-interest factors.

19        I know that everything that has been said on your

20   behalf is true.  Truly believed.  But I cannot give you what's

21   been asked and say to people that you can -- this defiance to

22   law enforcement.  I have to give consideration to the

23   seriousness to this offense, and I don't think amounts to a

24   misdemeanor sentence comes close.  And when I judge the

25   seriousness of the offense, I don't judge it in terms of

1  bedpans and Boy Scouts and some of the other things that are

2  tossed around.  The offense, the actual offense is actually

3  worth 15 years in prison, and lifetime supervision, and

4  Congress does not impose lifetime supervised release with

5  respect to any old crime.  It is an indication, which I see and

6  must take seriously, that this is not a serious offense, but an

7  extremely serious offense, and I have to send a message, that

8  deters others.

9         Now whether it works, I can't say.  But the notion

10  that I need only be concerned with the lovesick or those that

11  want to engage in marriage and relationships, those are the

12  ones I need to be concerned about, I reject that.  The message

13  must be broader, and I intend to sentence you to the 48 months

14  that the Government has asked for.

15         I intend to impose a standard conditions of supervised

16  release, with one exception, that being standard condition

17  number four, because I don't think it makes any sense to talk

18  about ordering you to support your dependents when you

19  currently have none.  I intend to impose the conditions of

20  supervised release that have been included in addendum,

21  modifying one of them a little bit.  And I want to talk about

22  that.  A couple of things, there.  The one I'm choosing to

23  modify is the one that said, All of your computer use has to be

24  controlled by the probation department; that's a pipe dream.

25  I'm going to prohibit you from certain associations whether

1  that be over the Internet or no.  I'm going to require a

2  hundred hours of community service, and I want to be clear with

3  the probation department what my thinking with respect to that

4  is.  I'm not doing that in order to punish you, and I am not

5  doing that -- I'm doing that for a very special reason.  I want

6  you with regular people, because I don't think you have spent

7  much time, for one reason or another, whether it be the fault

8  of the things you have done, things others have done, or a

9  combination, you have ended up almost like a kid in a bubble,

10  and I want to tear the bubble apart, and what I want probation

11  to do is put you places where you are meeting with and

12  interacting with ordinary regular people.  I don't want

13  community service where she is licking stamps in some back room

14  or something silly like that.

15       The other thing that you may scratch your head about

16  is that I am going to prohibit any possession of any degree of

17  black powder or explosive material.  When you say Why, I'm not

18  a Jihadist?  And my answer to that is, You walk into a Jewish

19  neighborhood, you go into a bookstore, you buy a book on how to

20  make bombs, it's not funny.  And I am not going to take a

21  chance with you.  So any record you want to make by way of

22  objection to what I have proposed?

23       *MR. HOLLOWAY:*  No, Your Honor.  Thank you.

24       *THE COURT:*  Any record you wish to make by way of

25  objection to what I have proposed?

1          *MR. PEPIN:* No. I have made my arguments, Your Honor.

2          *THE COURT:* Pursuant to the Sentencing Reform Act of

3 1984, it is the judgment of the Court that the defendant,

4 Shannon Maureen Conley, is hereby committed to the custody of

5 the bureau of prisons to be imprisoned for a term of 48 months.

6          Upon release from imprisonment the Defendant shall be

7 placed on supervised release for a term of three years. Within

8 72 hours of release from the custody of the bureau of prisons,

9 she shall report in person to the probation office in the

10 district to which she is released.

11          While on supervised release the Defendant shall not

12 commit another federal, state or local crime; shall not possess

13 a firearm as defined in 18 U.S.C. Section 921; shall comply

14 with the standard conditions that have been adopted by this

15 Court, all of which I have individually reviewed, and each of

16 which I find to be related to the factors for sentencing set

17 forth in 18 U.S.C. Section 3553.

18          The defendant shall not unlawfully possess a

19 controlled substance. She she refrain from any unlawful use of

20 a controlled substance. She shall submit to one drug test

21 within 15 days of placement on supervision and two periodic

22 tests thereafter.

23          The defendant shall cooperate in the collection of DNA

24 as directed by the probation officer. I find that the

25 following special conditions of supervised release are

determined to be reasonably related to the factors enumerated

in 18 U.S.C. Section 3553(a) and 18 U.S.C. Section 3583(d).

Further, based on the nature and the circumstances of the offense, the history and characteristics of this particular defendant, the following conditions do not constitute a greater depravation of liberty than reasonably necessary to accomplish the goals of sentencing.

One, the Defendant shall participate in and successfully complete a program of mental-health treatment as approved by the probation officer until such time as she is released from the program by the probation officer. She shall pay for the costs of treatment as directed by the probation officer.

Two, the Defendant shall remain medication compliant, and shall take all medications that are prescribed by her treating psychiatrist or mental-health professional. The Defendant shall cooperate with random blood tests as requested by the treating psychiatrist and/or supervising probation officer to ensure that a therapeutic level of her prescribed medications is maintained.

Three, and I am needing to switch -- hold on one minute. Three, the defendant is prohibited from any communication with any individual who's known to be associated with ISIS, al-Qaida or any other terrorist organization.

Additionally, she shall not access or review magazine,

1    publications or websites which are primarily associated with

2    terrorist organizations, specifically and including Inspire

3    Magazine, and The Preachings of Anwar al-Awlaki.

4         Four, the Defendant shall not possess any quantity of

5    black powder or any explosive material.

6         Five, the defendant shall not obtain or possess any

7    passport or international travel documents.  Any existing

8    passport or international travel documents the defendant has

9    shall be surrendered to the supervising probation officer

10   within 72 hours upon her release from custody.

11        Six, the Defendant shall perform 100 hours of

12   community service as directed by the probation officer.  Both

13   the type of work and the agency where the Defendant performs

14   her community service shall be approved by the probation

15   officer.

16        And this is an instruction rather than a condition, I

17   do not want this to be associated with the homeless.

18        *PROBATION:*  Do you want to add that, Your Honor --

19        *THE COURT:*  Add it.

20        *PROBATION:*  Okay.  Thank you.

21        *THE COURT:*  Seven, the defendant shall submit her

22   person, property, house, residence and papers and computers and

23   any other electronics or data communications, storage devices

24   or media or office to a search conducted by the United States

25   Probation Officer.  Failure to submit to such a search may be

1    grounds for revocation of release.  The defendant shall warn

2    any other occupants of the premises that they may be subject to

3    search pursurnt to such condition; the premises, not the other

4    occupants.  An officer may conduct a search pursuant to this

5    condition only when reasonable suspicion exists that the

6    defendant has violated a condition of her supervision, and that

7    the areas to be searched contain evidence of this violation.

8    Any search must be conducted at a reasonable time and in a

9    reasonable manner.

10        The defendant shall pay a special assessment of $100

11   which is due and payable immediately.  I find that she does not

12   have the ability to pay the fine, and so the Court will waive

13   the imposition of a fine in this case.

14        The Defendant is advised of the right to appeal the

15   sentence.  If the Defendant desires to appeal, a Notice of

16   Appeal must be filed with the Clerk of the Court within 14 days

17   after entry of judgment or the right to appeal will be lost.

18        If the Defendant is unable to afford an attorney for

19   an appeal, the Court will appoint one to represent her.  If she

20   so requests, the Clerk of the Court must immediately prepare

21   and file a Notice of Appeal on her behalf.

22        I also recommend that the bureau of prisons designate

23   a facility that is closest to the District of Colorado and

24   consistent with any security requirements that they may have.

25   And it is ordered that Ms. Conley is remanded to the custody of

1    the United States Marshal.

2          Is there anything further on behalf of the United

3    States?

4          *MR. HOLLOWAY:*  No.  Thank you, Your Honor.

5          *THE COURT:*  Or on behalf of, Ms. Conley?

6          *MR. PEPIN:*  No, Your Honor.

7          *THE COURT:*  We will be in recess.

8          *THE COURTROOM DEPUTY:*  All rise.  Court is in recess.

9       (Recess at 4:42 p.m.)

10                    REPORTER'S CERTIFICATE

11

12       I certify that the foregoing is a correct transcript from
     the record of proceedings in the above-entitled matter.

13

14       Dated at Denver, Colorado, this 18th day of March, 2015.

15                    s/Tammy Hoffschildt

16                    _____

17                    Tammy Hoffschildt, FCRR RMR,CRR

18

19

20

21

22

23

24

25